# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 16-10613

United States Court of Appeals
Fifth Circuit

**FILED**
July 27, 2017

Lyle W. Cayce
Clerk

DALLAS INDEPENDENT SCHOOL DISTRICT,

Plaintiff - Appellant

v.

MICHELLE WOODY, as next of friend to K.W.,

Defendant - Appellee

Appeal from the United States District Court
for the Northern District of Texas

Before REAVLEY, OWEN, and SOUTHWICK, Circuit Judges.

LESLIE H. SOUTHWICK, Circuit Judge:

The Individuals with Disabilities Education Act ("IDEA" or the "Act") requires public school districts to provide all resident disabled students with a "free appropriate public education," or "FAPE." Arguing that Dallas Independent School District impermissibly failed to offer her high-school daughter FAPE during her senior year, Michelle Woody sought reimbursement for the cost of her daughter's private-school tuition. The hearing officer found for Woody, awarding her $25,426.93. The district court affirmed but reduced the award to $11,942.50. The school district appealed. Woody did not. We AFFIRM in part, REVERSE in part, and REMAND.

No. 16-10613

## FACTUAL AND PROCEDURAL BACKGROUND

Kelsey Woody was a high-school student with learning disabilities. After starting high school at a Dallas private school, she moved to Los Angeles, California, with her mother, Michelle Woody ("Woody"). Once there, Woody enrolled Kelsey at private school and then at a Los Angeles Unified School District ("LAUSD") public school. Upon learning of Kelsey's educational history, LAUSD evaluated Kelsey in April 2012. That evaluation uncovered learning problems, so LAUSD recommended that Kelsey be referred to an Individual Education Program ("IEP") team to determine her special-education options. In May 2012, the IEP team met and concluded that Kelsey was eligible for services under the Act. The resulting IEP designated general education, which meant a public school, as her proper instructional setting.

Kelsey's situation worsened that summer. While in South Korea visiting her sister, she had a psychotic break. She returned to California yet continued to experience "dramatic symptoms of an emotional breakdown despite mood stabilization medication[.]" She was therefore admitted to the UCLA Psychiatric Hospital, where she was diagnosed with "schizophrenia in addition to her previously diagnosed learning disabilities[.]" As a result, her doctors recommended a specialized learning environment with significant support and close monitoring, noting in a September 2012 follow-up that Kelsey was "far too fragile to be placed on a general education campus."

Still, LAUSD offered only general-education services. At this point, Woody moved Kelsey back to Dallas to live with her godparents. One of them is a psychiatrist, likely equipping them to better provide Kelsey with the support necessary to transition her out of the hospital setting. Woody, who was finishing an advanced degree at the University of Southern California, remained in Los Angeles for the 2012–13 school year.

2

After moving her to Dallas, Woody enrolled Kelsey at the private Winston School, which offered a specialized learning environment for students with learning disabilities. Kelsey's performance improved, but she continued to receive psychiatric treatment. In January 2013, Children's Medical Center in Dallas evaluated Kelsey, finding her to be psychologically vulnerable and recommending "continued follow-up with her psychiatrist for medication management, consistent structure with no significant life changes, and family and individual therapy."

Meanwhile, Woody initiated a due-process action against LAUSD to challenge its failure to offer Kelsey private-school placement. The parties settled in April 2013, and LAUSD agreed to reimburse Woody for educational costs associated with Kelsey's placement at the Winston School and for counseling services during the 2012–13 school year. LAUSD also agreed to place Kelsey at an appropriate non-public school for the 2013–14 school year. LAUSD's May 2013 IEP placed Kelsey at the Westview School in California, not the Winston School in Dallas.

Woody moved back to Dallas in August 2013, and Kelsey became a resident of the Dallas School District, which hereafter we will call the "District." On September 16, 2013, Woody notified the District of Kelsey's new residence and of Woody's desire for Kelsey to receive FAPE in the form of tuition reimbursement. She provided the IEP from May 2013 that placed Kelsey in a non-public school for her senior year and indicated that she was a student with a disability. She also provided the Children's Hospital evaluation from January and other background information. In turn, she asked the District to provide her with the necessary forms.

Kelsey remained at the Winston School that fall. As the district court found, "[t]he record is clear that Woody believed it critical for Kelsey to remain at the Winston School and intended, from the beginning, to pursue funding for

3

her tuition from" the District. The District responded to Woody's letter on October 4 requesting additional information, including the complete IEP team document from 2012, the most recent Full and Individual Evaluation ("FIE"), and all records from the Winston School. Woody provided those documents on November 5. On November 13, the District sought consent from Woody to obtain LAUSD records, which Woody granted on November 19.

On November 18, the District contacted Woody to schedule an Admission, Review, and Dismissal Committee ("ARD Committee") meeting.[1] An important purpose of such a meeting is to allow parents to participate in the shaping of an IEP for their children. *See* 34 C.F.R. § 300.322. The parties agreed to meet on December 17. The District asked that Winston School personnel attend the meeting, but that school had a policy requiring payment of staff for offsite meetings. By November 22, Woody had a copy of this policy but did not inform the District of its existence until December 13. Neither party was willing to pay for Winston staff to attend, so none of Kelsey's teachers were present at the meeting.

Woody learned when she arrived at the meeting that the District considered it to be a "student transfer meeting," not an ARD Committee meeting. The District's purpose in having the meeting, which apparently is not required under the IDEA, was "to document a student transfer into the district and plan for comparable services." In turn, the transfer document provided that Kelsey would receive temporary special-education services. No such services were offered or provided, though, and it is unclear whether the District actually determined Kelsey to be eligible. The District did not offer FAPE at the meeting.

---

[1] The IDEA refers to "IEP teams." 20 U.S.C. § 1414(d)(1)(B); 34 C.F.R. § 300.321. Texas calls such a team the ARD Committee. 19 TEX. ADMIN. CODE 89.1050(a).

The minutes from the December meeting show that the District rejected LAUSD's IEP and planned to evaluate Kelsey and develop its own IEP. The District was aware of Kelsey's disabilities (including her diagnosis of schizophrenia) and Children Medical Center's recommendations. It was also aware that LAUSD had found her to be eligible for special-education services under IDEA. It did not offer temporary services but instead sought consent to evaluate Kelsey. Woody gave consent on January 24, 2014, and the District completed an FIE and provided it to Woody on April 8. The initial FIE found Kelsey to be IDEA-eligible. On April 16, though, the District gave Woody a revised FIE in which its psychologist concluded Kelsey was not IDEA-eligible due to her successful performance in the "mainstream" environment at the Winston School. The FIE did not acknowledge Children's recommendation that any significant life change could place Kelsey at high risk for a relapse of psychosis. The ARD Committee agreed that Kelsey did not require special-education services.

Woody disagreed and asked for an Independent Educational Evaluation ("IEE"), which the District denied. Woody then sought a psychological consultation from a different psychologist, who reviewed relevant materials and observed Kelsey at school. That psychologist concluded that the District's FIE was defective, specifically taking issue with the FIE's description of the Winston School as a "mainstream setting." She concluded that a change in schools would have been devastating, that Kelsey needed special-education services, and that the Winston School was a proper placement. She provided a report (not an IEE) reflecting these conclusions to the District on May 20.

As a result, the ARD Committee reconvened on May 22. It determined that Kelsey was IDEA-eligible and developed an IEP for Kelsey to be implemented at a District high school from April 2014 to April 2015. Kelsey was to graduate in May 2014, though. Woody disagreed with the IEP for four

No. 16-10613

reasons: (1) the IEP was futile so close to graduation; (2) the IEP offered inadequate services and supports; (3) the IEP's goals and objectives failed to address Kelsey's needs; and (4) the IEP placed Kelsey at a public school for the last week of high school.

The May 22 proposed IEP was the District's first attempt to offer FAPE. That summer, Woody's psychologist completed an IEE and provided it to the District. The District never reconvened the ARD Committee to consider the IEE, so the district court found that the District "never finalized the May 2014 IEP, thereby never finalizing its offer of FAPE."

In October 2014, Woody requested a due-process hearing. The hearing officer concluded that the District "had a legal obligation to make a timely offer of FAPE available to [Kelsey] for the 2013–14 school year[.]" Because it failed to do so, the hearing officer concluded that Woody was entitled to reimbursement in the amount of $25,426.93, an amount that covered the cost of sending Kelsey to the Winston School for the entire 2013–14 school year.

The district court conducted a bench trial. It affirmed in part, agreeing that the District impeded Kelsey's right to FAPE for 2013–14, but it reduced the reimbursement award to $11,942.50 because it found that Woody's "conduct contributed in part to the imbroglio before the court." *See Dallas Indep. Sch. Dist. v. Woody,* 178 F. Supp. 3d 443 (N.D. Tex. 2016). The District now appeals. Woody does not cross-appeal.

## DISCUSSION

### I. *Overview of the Individuals with Disabilities Education Act*

When reviewing the decision of the due-process officer, the district court's review is "virtually *de novo*." *Cypress-Fairbanks Indep. Sch. Dist. v. Michael F.,* 118 F.3d 245, 252 (5th Cir. 1997). Although the district court is to give "due weight to the hearing officer's findings, the court must ultimately

reach an independent decision based on a preponderance of the evidence." *Id.* (citation and quotation marks omitted).

This court, in turn, reviews legal questions *de novo* and factual questions for clear error. *See Klein Indep. Sch. Dist. v. Hovem*, 690 F.3d 390, 395 (5th Cir. 2012). "Mixed questions should be reviewed under the clearly erroneous standard if factual questions predominate, and *de novo* if the legal questions predominate." *Seth B. ex rel. Donald B. v. Orleans Par. Sch. Bd.*, 810 F.3d 961, 967 (5th Cir. 2016). The district court's ultimate conclusion that the District failed to provide FAPE is a mixed question of law and fact in which legal questions predominate, so we review it *de novo*. *See Hovem*, 690 F.3d at 395. We review the factual findings themselves for clear error. *Seth B.*, 810 F.3d at 967. We will not reverse underlying findings unless we are "left with a definite and firm conviction that a mistake has been committed." *R.P. ex rel R.P. v. Alamo Heights Indep. Sch. Dist.*, 703 F.3d 801, 808 (5th Cir. 2012).

Generally, the Act "offers States federal funds to assist in educating children with disabilities." *Endrew F. ex rel. Joseph F. v. Douglas Cnty. Sch. Dist. RE-1*, 137 S. Ct. 988, 993 (2017). In exchange for such funds, States pledge to ensure "[a] free appropriate public education is available to all children with disabilities residing in the State between the ages of 3 and 21 . . . ." 20 U.S.C. § 1412(a)(1)(A). Children with disabilities are those evaluated under IDEA and determined to have some qualifying intellectual, physical, or emotional disability. *Id.* § 1401(3)(A); 34 C.F.R. § 300.8(a).

Once a school accepts that one of its students is eligible under IDEA, the school must develop an individualized program of education for that student. *Michael F.*, 118 F.3d at 247. The program is described in detail in the IEP, which is "a written statement prepared at [an ARD Committee] meeting attended by a qualified representative of the school district, a teacher, the child's parents or guardians, and, when appropriate, the child [her]self." *Id.*

The IEP must be "reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances." *Endrew F.*, 137 S. Ct. at 999. It must match the school's services with the needs of the child, *Richardson Indep. Sch. Dist. v. Michael Z.*, 580 F.3d 286, 292 (5th Cir. 2009), and is "the centerpiece of the statute's education delivery system for disabled children," *Honig v. Doe*, 484 U.S. 305, 311 (1988).

Although school districts are required to provide a free appropriate public education — a FAPE — to all eligible students, a district's obligations vary depending on the circumstances of the student and her placement. Relevant here, IDEA and its regulations impose obligations on the public-school district even for students who are being educated in private schools. 20 U.S.C. § 1412(a)(10); 34 C.F.R. §§ 300.130–300.148.

## II.    *The School District's Appellate Arguments*

The District raises three grounds for reversal. First, its central claim is that the district court created a new category of student under IDEA who is entitled to reimbursement for tuition, namely, a child placed in private school by a parent who has made it clear she will reject any offer of a public-school education. Its closely related second argument is that the district court erred by not recognizing either that Kelsey was a parentally placed private-school student or that Woody categorically rejected FAPE. Finally, the District argues that it did comply with its IDEA obligation to offer FAPE to Kelsey, a parentally placed student in private school.

The District relies heavily on the specific section of IDEA that discusses how local public school districts are to assist students who have been placed in private schools. *See* § 1412(a)(10). The first subsection discusses children enrolled by their parents in private school and provides for the children's participation in special education and related services. § 1412(a)(10)(A). The

second subsection requires that the public school pay for the special education outlined in a child's IEP if the child is in a private school because the public school is consensually using it "as the means of carrying out" its IDEA obligations. § 1412(a)(10)(B). Finally, a child may be placed in a private school without the consent of the public school. § 1412(a)(10)(C). Different provisions address when the costs of the special education must be reimbursed, which largely turn on whether the public school offered FAPE. *Id.*

### A. Did the district court create a non-statutory category of private-school students and thereby err in awarding temporary services?

The following is the section of the opinion in which the district court allegedly created a new category for reimbursement:

> Therefore, a student, like Kelsey, who was enrolled in the Winston School for her senior year as a result of a settlement agreement and IEP, developed by a local school district, should at a minimum receive the rights provided to students who were unilaterally placed in private school by her parent. 34 C.F.R. § 300.132, 34 C.F.R. § 300.148(a). Under IDEA, Kelsey should be given greater rights than a parentally placed student in private school. *Sam K.* [*ex rel. Diane C. v. State of Hawaii Dep't of Educ.*, 788 F.3d 1033, 1039–40 (9th Cir. 2015)] (holding that a student's private school tuition should be reimbursed where parent did not unilaterally place student in private school because the school district tacitly consented to the private school attendance before proposing a different placement). Therefore, at a minimum, DISD was obligated to convene an ARDC meeting and make an offer of FAPE to Kelsey in a timely manner. *See* 34 C.F.R. § 300.148.

*Woody*, 178 F. Supp. 3d at 469–70.

Before analyzing the law, we note that the District disagrees with the finding that Kelsey was at the Winston School during her senior year as part of the settlement with LAUSD. In that settlement, LAUSD agreed to reimburse tuition at the Winston School for the 2012–13 school year, but the later May 2013 IEP placed her at a private school in Los Angeles for the 2013–

14 school year. Woody testified that she "worked out" that Kelsey would also spend her senior year at the Winston School, yet nothing in writing supports that change to the May 2013 IEP. The district court's statement that Kelsey was entitled to "greater rights" than a student placed in a private school because of a disagreement with what a public school offered appears to be based on this finding that LAUSD and Woody agreed to the Winston School. *Id.* at 470. Regardless, the only real holding that comes from this "new category" paragraph is that the District had to have an ARD Committee meeting and timely offer FAPE. That is neither revolutionary nor incorrect.

A slightly later part of the district court's analysis is more critical in understanding why reimbursement was ordered for the entire second half of the school year. The court relied on several related sections of IDEA and the regulations to conclude that the District had to provide temporary services:

> Yet when it rejected LAUSD's IEP, it was obligated to make an offer of FAPE to Kelsey on a temporary basis while it evaluated her, because IDEA clearly requires that an IEP be in place for a disabled student "residing in the State between the ages of 3 and 21." 20 U.S.C. § 1412(a)(1)(A); *see also* 34 C.F.R. § 300.101(a)–(c); 34 C.F.R. § 300.323(f); *Sam K.*, 788 F.3d at 1039–40.

*Id.* We see operating in both quoted sections an analytical principle that appeared early in the opinion. That is, the district court concluded that interpretive flexibility would be needed in order to resolve this dispute, writing that "IDEA and the implementing federal regulations did not predict the unique factual situation before the court." *Id.* at 465.

The district court thus did not conclude that any IDEA provision obligated the District to provide temporary or comparable services. Instead, in the just-quoted passage, the district court relied on three distinct authorities to hold that because the District would not adopt or rely on the IEP from LAUSD, it was obligated to make an offer of FAPE to Kelsey on a temporary basis. *See id.* at 470.

No. 16-10613

The court first relied on the section of the IDEA that states that all children with disabilities of the proper age must be provided FAPE. *See* § 1412(a)(1)(A); *see also* 34 C.F.R. § 300.101(a)–(c). We disagree with the district court's reliance on this section, though we are mindful of the court's broader concern. That is, the facts of this case may expose a gap in IDEA's coverage. A school district had already determined that Kelsey was disabled under IDEA, but after moving to a new district in a new state, she still had to wait through a successive evaluation to gain entitlement to services. All along, there was uncertainty about whether there would be reimbursement.

As we understand IDEA, it is designed to avoid situations like this. It thus contains various provisions that seek continuity of services for disabled children who move from state to state. When a child with a disability transfers to a new state during the summer, for example, school districts are required to have an IEP in effect for that child by "the beginning of [the] school year[.]" *See* 34 C.F.R. § 300.323(a). The *Federal Register* clarifies that this provision is meant to limit a potential gap in coverage when a student with a disability moves to a new state:

> [Section 300.323(a)] is clear that at the beginning of each school year, each [local education agency] . . . must have an IEP in effect for each child with a disability in the agency's jurisdiction. Therefore, public agencies need to have a means for determining whether children who move into the State during the summer are children with disabilities and for ensuring that an IEP is in effect at the beginning of the school year.

71 FED. REG. 46,540, 46,682 (Aug. 14, 2006).

Textually, this makes sense. Section 300.323(a) applies only to children with disabilities. "Child with a disability," in turn, is defined as "a child evaluated in accordance with §§ 300.304 through 300.311 as having [an enumerated disability] who, by reason thereof, needs special education and related services." 34 C.F.R. § 300.8(a)(1). The referenced subsections deal with

11

the evaluation procedures for determining whether a student is disabled. Thus, a student who already has an IEP (from anywhere) indicating a disability and therefore eligibility under IDEA and who lives in the district's jurisdiction falls within Section 300.323(a). A school district must have an IEP in place for such a student at the beginning of each school year.

On the other side of that coin, if the same child transfers from out of state during the school year with an existing IEP, Section 300.323(f) would likely apply. The district court relied on this section, too. That section requires comparable services to be provided pending an initial evaluation "[i]f a child with a disability (who had an IEP that was in effect in a previous public agency in another State) transfers to a public agency in a new State, and enrolls in a new school within the same school year[.]" 34 C.F.R. § 300.323(f). This regulation preserves both the District's right to evaluate and the child's continuity of special-education services.[2] Again, Section 300.323(f) applies only to children with disabilities, thereby reinforcing our understanding that IDEA aims to avoid successive-evaluations-without-services situations like this. These two provisions cover almost every transfer student by addressing both school-year and summer transfers.

Kelsey, though, does not fit under either provision. First, she was weeks into her second year at the Winston School before the District was notified of a new, potentially eligible student within its boundaries. Thus, her circumstances did not trigger the District's obligations under Section 300.323(a). Likewise, the natural reading of Section 300.323(f) does not include Kelsey. She did not enroll in a new school for 2013–14 but instead

---

[2] Notably, the District argues that the transfer student is required to enroll in a public school for Section 300.323(f) to become operative. For support, it cites an unpublished district court opinion. *See N.B. v. Hawaii*, Civ. No. 13-00439, 2014 WL 3663452, at \*4 (D. Haw. 2014). We need not and do not decide whether that is correct.

remained enrolled at the Winston School.  For the District to be obligated to her as a transfer student, it seems we would have to read "enrolls in a new school" as equivalent to "transfers to a new public agency."  Even if that is a natural reading, though, it cannot be correct in light of context.  That is because the latter phrase is also used in Section 300.323(f) and immediately precedes the former.  Both are required by the provision's plain text, and each has a distinct meaning.

From all this, it might still be argued that Section 1412(a)(1)(A) generally requires that FAPE be made "available to all children with disabilities residing in the State," which implies that it fills any gaps left by Sections 300.323(a) and (f) for qualifying children with disabilities.  Woody generally argues as much.  In the context of the provisions at issue, we disagree.  Most important here, one provision merely provides a general rule that is worked out by other more specific provisions.  The general rule, for example, does not tell us *when* a district must make FAPE available, whereas the provisions just discussed, Sections 300.323(a) and (f), describe more precisely the type and timing of the services or benefits a district must provide when a student transfers during the school year or summer, so long as the conditions in those provisions are met.  Again, these provisions cover almost all out-of-state transfer students.

Even when these do not apply, however, IDEA has another set of specific provisions (the child-find provisions) that provide further protection but without ensuring the same continuity of services or benefits.  These child-find provisions require a district to identify, locate, and evaluate "children with disabilities residing in the State, including . . . children with disabilities attending private schools[.]"  20 U.S.C. § 1412(a)(3)(A).  They then provide specific timelines for how quickly such a child must be located and evaluated, but they notably do not provide for temporary services.  *See, e.g.*, 34 C.F.R.

13

No. 16-10613

§§ 300.301(c) & 300.323(c); *see also* 19 TEX. ADMIN. CODE § 89.1011. Thus, although the child-find provisions do not require the near-immediate provision of FAPE or comparable services like Sections 300.323(a) and (f), they do require a school district to ensure it provides FAPE within a defined time period. Because we apply specific provisions over general ones, Section 1412(a)(1)(A)'s general rule neither compels nor counsels us to recognize a new right to temporary FAPE when a more specific provision applies. *See Law v. Siegel*, 134 S. Ct. 1188, 1194 (2014). Rather, the child-find provisions, which are more specific, apply here. Ultimately, then, the District was not required to adopt or rely on LAUSD's IEP but was instead entitled to proceed in a reasonable fashion to determine Kelsey's needs. *See Michael C. ex rel. Stephen C. v. Radnor Twp. Sch. Dist.*, 202 F.3d 642, 651 (3d Cir. 2000); *J.B. ex rel. B.B. v. Lake Washington Sch. Dist.*, No. C12-0574RSL, 2013 WL 195375, at *2 (W.D. Wash. Jan. 17, 2013).

Finally, the district court cited an opinion from another circuit. *See Sam K.*, 788 F.3d at 1039–40. Cogently written and persuasive, the opinion is also inapplicable. There, the disabled student had been in private school for three years based on a settlement with the district. *Id.* at 1036. The parents and district agreed to meet to discuss placement for a fourth year, but the meetings extended through the school year and no placement was agreed upon until January. *Id.* Meanwhile, the student remained in private school. *Id.* The issue was whether the fourth-year placement was unilateral under state law. *Id.* at 1038. Those are not our facts, and that is not our issue.

We summarize our discussion on temporary services. For one thing, Kelsey's facts seemingly expose a gap in immediate coverage, but the facts are not entirely unaddressed by the Act. This may be unfortunate, but IDEA does not impose upon the District an obligation to provide Kelsey an immediate interim FAPE or services of any kind. In other words, we see nothing under

IDEA or any regulations that would activate a duty to provide temporary services on these facts. Perhaps Congress would have addressed Kelsey's facts more intentionally had it foreseen them. Nonetheless, although "it is of course our job to apply faithfully the law Congress has written, it is never our job to rewrite a constitutionally valid statutory text under the banner of speculation about what Congress might have done had it faced a question that, on everyone's account, it never faced." *Henson v. Santander Consumer USA Inc.*, 137 S. Ct. 1718, 1725 (2017). Accordingly, without adopting the characterization that the district court created a new category of IDEA private-school student, we agree that the court's order cannot be supported based on a requirement of temporary services for transfer students.

> *B. Did the district court err in not recognizing that Kelsey was a parentally placed private-school student?*

The District next argues that Kelsey falls into the Section 1412(a)(10) category of being parentally placed in the private school. If so, a significant limitation on the District's duties would come into play:

> Subject to subparagraph (A), this subchapter does not require a local educational agency to pay for the cost of education, including special education and related services, of a child with a disability at a private school or facility if that agency made a free appropriate public education available to the child and the parents elected to place the child in such private school or facility.

§ 1412(a)(10)(C)(i). Thus, if the District offered a proper and timely FAPE, there is not an obligation to reimburse for private-school expenses. The District contends that it so offered FAPE, thereby barring reimbursement.

The District also argues that there are other statutory reasons Woody cannot qualify for reimbursement. It seems to rely on the following language to argue that because Kelsey was not placed at the Winston School due to her

mother's disagreement with a public-school FAPE offered by the District, the statute permitting reimbursement is inapplicable:

> If the parents of a child with a disability, who previously received special education and related services under the authority of a public agency, enroll the child in a private elementary school or secondary school without the consent of or referral by the public agency, a court or a hearing officer may require the agency to reimburse the parents for the cost of that enrollment if the court or hearing officer finds that the agency had not made a free appropriate public education available to the child in a timely manner prior to that enrollment.

*Id.* § 1412(a)(10)(C)(ii).

The District is correct that the precise factual situation envisioned by the subsection we just quoted is not what happened here. Yet the conclusion it wishes us to reach from that, namely, that therefore Woody cannot recover reimbursement for private-school tuition, ignores a Supreme Court decision that addresses the exact point. *See Forest Grove Sch. Dist. v. T.A.*, 557 U.S. 230 (2009). We use the word "ignore" with some deliberation. The District did not cite *Forest Grove* in either its original brief or in its reply, despite the considerable focus on the opinion by Woody in her brief.

In *Forest Grove*, the Court interpreted Section 1412(a)(10)(C), which had been added to the original 1970 Act by amendments in 1997. *Id.* at 233. Important here, the question was whether Section 1412(a)(10)(C) was "the exclusive source of authority for courts to order reimbursement when parents unilaterally enroll a child in private school." *Id.* at 241. The Court held it was not. *Id.* at 241–42. By interpreting the added provision as bringing clarity to when reimbursement was available but not being an exhaustive list of those situations, the Court was able to interpret Section 1412(a)(10)(C) more consistently with two of its precedents. *Id.* (citing *Sch. Comm. of Burlington v. Dep't of Educ.*, 471 U.S. 359 (1985) & *Florence Cnty. Sch. Dist. Four v. Carter ex rel. Carter*, 510 U.S. 7 (1993)).

16

Instead, the Court looked to those precedents, which dealt with reimbursement under Section 1415, to provide the general requirements for reimbursement under IDEA:

> IDEA authorizes reimbursement for the cost of private special-education services when a school district fails to provide a FAPE and the private-school placement is appropriate, regardless of whether the child previously received special education or related services through the public school.

*Forest Grove*, 557 U.S. at 247. Consequently, it was not necessary for Woody to show she placed her daughter in the Winston School for the 2013–14 academic year only after enrolling her in a District school, going through the evaluation process, and finally moving her after disagreement with the District's FAPE offer.

To be clear, and despite its broad reading of the availability of private-school-tuition reimbursement, the *Forest Grove* Court did not create a safe harbor for every parent who places her child in a private school for fear of what a public school may or may not offer. A public school district is not required to reimburse for special-education expenses if that district "made a free appropriate education available to the child and the parents elected to place the child in such private school or facility." § 1412(a)(10)(C)(i). The possibility of reimbursement arises only if FAPE is not timely offered after the school district is given an opportunity to develop an IEP. Hence Woody took a financial gamble of not being reimbursed when she placed Kelsey in a private school without first allowing the District to seek to comply with its obligations under IDEA. In the last issue, we determine the result of Woody's gamble.

*C. Did the District comply with its obligation to offer a FAPE in timely fashion, and if not, what relief is appropriate?*

As we just noted, reimbursement of private-school costs is permitted "[1] when a school district fails to provide a FAPE and [2] the private-school

placement is appropriate . . . ." *Forest Grove*, 557 U.S. at 247. Once a court makes that conclusion, "it must consider all relevant factors, including the notice provided by the parents and the school district's opportunities for evaluating the child, in determining whether reimbursement for some or all of the cost of the child's private education is warranted." *Id.* The use of "including" indicates to us that this relevant-factor list is not exhaustive. As we explain, we consider other factors to be relevant here.

We first note the scope of our analysis that follows. The parties and district court accepted that the new school district was entitled to engage in the usual evaluation process, though there is much disagreement about when that evaluation should have ended and what the District's obligations for reimbursement were. No one has argued that IDEA, through its different but complementary rules for dealing with summer and mid-year transfers, has effectively required that any new student in a school district is immediately entitled to some benefits while the issues of eligibility are resolved in the new school. For this case, then, we accept what all others in the litigation have accepted: the District properly engaged in some reasonable evaluation process before its obligation to the child could arise.

The District has several contentions supporting the position that it fulfilled its obligation to this private-school student. A key premise is that Woody made it clear from her initial notification to the District that she had no intention of allowing Kelsey to attend a District school. She demanded reimbursement for the expenses of a private school that she had already been attending for several weeks. Because offering FAPE in a District school would have allegedly been futile, the District implies its obligations were lessened or eliminated. Whether it was required to offer FAPE, though, the District argues it did so by making a good-faith effort to evaluate the potential student, developing an IEP, and offering an appropriate education in a District school.

18

The district court found there to be "strong evidence that Woody would not have accepted [the District's] offer of FAPE." *Woody*, 178 F. Supp. 3d at 470. Still, the court held that that the District was required to prepare an IEP through the usual procedural steps. *Id.* at 471. As a general rule, the fact that a parent is initially reluctant to accept special education at a public school neither alters nor extinguishes the school district's obligation to make an offer of such education. *See Boose v. District of Columbia*, 786 F.3d 1054, 1056 (D.C. Cir. 2015).

To be sure, an absolute demand by a parent for reimbursement and a clear refusal to consider any potential public-school placement might alter the analysis. It also might not, but here the district court found Woody had not clearly refused any prospective offer of FAPE from the District. *See Woody*, 178 F. Supp. 3d at 471. We find no clear error in that. This mother's insistence merely mirrored the doctors' insistence that Kelsey's fragile emotional condition effectively precluded a move from the settled environment of the Winston School. The District had the opportunity through a specific offer of a public education to convince otherwise.

We summarize our conclusions so far. The District was not obligated to provide Kelsey temporary services as a transfer student or to have an IEP in place when the school year began. Even so, Woody was not ineligible for reimbursement merely because she first placed her daughter in a private school and then requested the local public school district pay for the tuition. The District was obligated to develop a program that offered FAPE to Kelsey at some point after she sought it. Both the District and Woody needed to follow the procedures for evaluating the child and developing a timely IEP.

Two closely related questions remain: first, whether the District complied with its obligations; and second, whether Woody is entitled to any reimbursement. The district court held that the District failed timely to offer

No. 16-10613

FAPE. That conclusion rested in part on the court's erroneous imposition of a temporary-services requirement and its finding that no such services were offered. *See id.* at 470. The District argues it met the relevant timelines and offered FAPE.

We start with whether the District offered Kelsey FAPE through a timely IEP. The district court held it did not for three reasons: (1) the offer was never finalized; (2) the proposed IEP only covered the last week of Kelsey's senior year; and (3) the District never reconvened the ARD Committee to consider the Independent Education Evaluation, or IEE. *Id.* at 470–72. Woody adds a fourth: the offer was meaningless because it was made after Kelsey had completed her required coursework for graduation.

Initially, the fact that the offer did not cover more than the last week of Kelsey's senior year cannot alone be the basis for determining that the District failed to make a timely offer of FAPE.[3] Holding as much would gut the applicable statutory and regulatory timelines, which under these facts gave the District a reasonable time to complete its own evaluation of Kelsey and propose an IEP. *See* 34 C.F.R. §§ 300.301(c), 300.323(c); *see also* 19 TEX. ADMIN. CODE § 89.1011. These timelines are not idle requirements. They allow school districts to evaluate the student so an IEP may be proposed that "is constructed only after careful consideration of the child's present levels of achievement, disability, and potential for growth." *See Endrew F.*, 137 S. Ct. at 999. If the District complied with the relevant child-find timelines and proposed a proper IEP, it did not violate the Act on that basis.

---

[3] The time period for the District's May 22 IEP was from April 24, 2014, to April 24, 2015, so basically for all of the following school year. The school district's obligation to make FAPE available to a disabled student ceases, however, once that student has graduated with a regular high-school diploma. *See* 34 C.F.R. § 300.102(a)(3).

Even if the District complied with the relevant timelines, though, it was obligated to "offer an IEP reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances." *See id.* The problem here, if the District truly acted within a reasonable time, is that it took until a week before graduation to finish. By then, any educational program could only be calculated to allow minimal progress. Indeed, placing Kelsey into a public school for one week of school would have been all but pointless, and there is evidence it could have been devastating in light of her emotional and psychological difficulties.

Regardless, one clear default by the District was it did not reconvene the ARD Committee to consider the independent evaluation, or IEE, that Woody had obtained after being informed that public school was the proper placement. That refusal made the May 22 IEP the District's final word on what it would offer. Though it might seem futile to go through the motions of reconsidering an offer to a student who had graduated, there are reasons the District should have done so. First, the regulation says the public agency "must" consider a properly obtained IEE. 34 C.F.R. § 300.502(c). Second, the IEE concluded that the Winston School was an appropriate placement and that the public-school placement proposed by the District was not. Although the District had no further obligation to provide education after graduation, it was required to consider the IEE as it affected Kelsey's right to reimbursement for private-school expenses.

The district court never held, as it might have if it accepted Woody's evidence, that any placement in public school was inappropriate. Instead, the court held FAPE was never offered because it was never finalized. We agree with the district court that reconsideration of the IEP in light of the IEE was necessary, and thus the IEP was never finalized. Still, not all procedural

violations are transformed into substantive violations. *E.g.*, *J.S. v. N.Y.C. Dep't of Educ.*, 104 F. Supp. 3d 392, 404 (S.D.N.Y. 2015).

We consider these events, though, to be a substantive failure to offer FAPE from at least April 24 until the end of the semester. The District was obligated to "offer an IEP reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances." *See Endrew F.*, 137 S. Ct. at 999. It did not. Kelsey had completed her coursework and was scheduled to graduate in a week. Placing her in public school for her final week of school would have been nonsensical and potentially devastating.

We are of course mindful of the circumstances. The District made an offer on May 22, which it argues was within the permitted regulatory timeline. In light of the somewhat unusual circumstances here, though, the May 22 IEP "was insufficient to confer any educational benefit upon [Kelsey] at all." *See Michael Z.*, 580 F.3d at 294. Reimbursement is therefore appropriate for at least the period of the 2013–14 school year covered by the May 22 IEP, or from April 24 to the end of the year. That is the same result that would obtain had the IEE been considered and had it led to an acknowledgement that the Winston School was the proper placement. Under the actual or the hypothetical scenario, the bigger question is whether the District's obligations for reimbursement are limited to the end of the semester or to some other, lengthier time period.

The district court used a lengthier time period, ordering reimbursement for the entire spring semester. As already discussed, however, reimbursement as well as other relief must be "appropriate," which is determined in light of the language and purposes of the Act. *See id.* at 292. In the usual case, reimbursement is awarded from the date the parents properly reject the IEP and enroll their child in private school. *See, e.g.*, *Houston Indep. Sch. Dist. v. V.P. ex rel. Juan P.*, 582 F.3d 576, 581, 591 (5th Cir. 2009). Yet Kelsey was

already attending the Winston School when the District failed to offer her FAPE.  Woody argues that reimbursement is appropriate for the entire semester, and she sought payments for the whole school year in district court.  We cannot agree.  The problem with the district court's grant of a full semester of reimbursement is that it in effect awards reimbursement without any holding that the District was obligated to offer FAPE for the entirety of the period of reimbursement.

This takes us back to basics.  IDEA "authorizes reimbursement for the cost of private special-education services when a school district fails to provide a FAPE and the private-school placement is appropriate[.]"  *See Forest Grove*, 557 U.S. at 247.  Such reimbursement is included in the district court's power to grant "appropriate" relief.  *See Burlington¸* 471 U.S. at 369.  Yet that modifier, though conferring "broad discretion," does not give the district court carte blanche.  *See id.*[4]  Instead, what relief is "appropriate" is to be determined "in light of the purpose of the Act," *id.*, the best evidence of which is the statutory text itself, *see Hotze v. Burwell*, 784 F.3d 984, 997 (5th Cir. 2015).  In light of controlling caselaw and common sense, then, we conclude that "appropriate" relief may not contravene the Act's plain language.[5]  Indeed, no case shown to us has permitted reimbursement for the time period before a school district's obligations under the Act arose.  *See Forest Grove*, 557 U.S. at

---

[4] *Cf. Bd. of Educ. v. Rowley*, 458 U.S. 176, 190 n.11 (1982) (rejecting the conclusion that courts and hearing officers should give content to "appropriate education" because it would seemingly "give the courts *carte blanche* to impose upon the States whatever burden their various judgments indicate should be imposed.").

[5] To be sure, the broad purpose of the Act "is principally to provide handicapped children with a free appropriate public education which emphasizes special education and related services designed to meet their unique needs."  *See Burlington*, 471 U.S. at 369 (quotation marks omitted).  Still, relief that may tend toward that broader purpose but that is inconsistent with the text Congress enacted cannot be considered "appropriate."

247; *Sam K.*, 788 F.3d at 1038–40; *Knable ex rel. Knable v. Bexley City Sch. Dist.*, 238 F.3d 755, 771 (6th Cir. 2001).

That makes sense. As discussed, IDEA gives a school district time to identify, locate, and evaluate disabled students, and it provides a deadline by which a district must propose an IEP. *E.g.*, 34 C.F.R. §§ 300.301(c), 300.323(c); *see also* 19 TEX. ADMIN. CODE § 89.1011. Unless the student is a transfer student, districts are not responsible for providing temporary or comparable services pending evaluation. *See* § 300.323(a), (f). These underlying obligations and timelines shed light on when private-school-tuition reimbursement may be appropriate. That is because such reimbursement is not a penalty but rather an after-the-fact order to the public school to do what it should have done sooner — it "merely requires the district 'to belatedly pay expenses that it should have paid all along.'" *Forest Grove*, 557 U.S. at 246 (quoting *Burlington*, 471 U.S. at 370–71). It follows, then, that another circuit has allowed reimbursement "of costs associated with the private school placement of the child," but not more than the district would have paid but for its failure to comply with the Act. *See Knable*, 238 F.3d at 770; *accord Moorestown Twp. Bd. of Educ. v. S.D.*, 811 F. Supp. 2d 1057, 1084 (D.N.J. 2011) ("[W]here the child was already attending a private school when the district denied him a FAPE . . . courts have calculated tuition claims from the point at which the school district should have acted . . . .").

Thus, reimbursement may be calculated from the date the District should have provided FAPE under the Act — but not earlier. Relevant to when the District should have acted are its child-find obligations, under which it was required to identify, locate, and evaluate "[a]ll children with disabilities residing in the State [such as Kelsey], including . . . children with disabilities attending private schools . . . ." 20 U.S.C. § 1412(a)(3).

24

## No. 16-10613

Pursuant to these obligations, Texas law requires a district to complete a Full and Individual Evaluation "not later than the 45th school day following the date on which the school district receives written consent for the evaluation . . . ." 19 TEX. ADMIN. CODE § 89.1011(c)(1).[6] The ARD Committee must make an IEP decision "within 30 calendar days from the date of the completion of the written" full evaluation. *Id.* § 89.1011(d); *see also* 34 C.F.R. § 300.323(c). Here, the district court held the District generally complied with these obligations, concluding that the completion of its evaluation "roughly seven months after" receiving notice was "reasonable." *See Woody*, 178 F. Supp. 3d at 468.

The first relevant time period is from the District's notice of Kelsey's disability and its request for consent to evaluate her. On September 19, 2013, the District received notice of Kelsey's residence and Woody's request for FAPE. Attached to Woody's notice was evidence of Kelsey's disabilities, including her May 2013 IEP and the letter from Children's Medical Center. There was some back and forth, but it took until late November for the District to determine that there should be a meeting, which it initially dubbed a "student transfer meeting." Ultimately, the District did not decide it needed to refer Kelsey to an evaluation until this December 17 meeting.

Woody argues that this initial delay was not justified. The district court held that the time that separated the locating, identifying, and evaluating was "reasonable" and therefore not did not violate the Act. *Id.* Notably, the regulations cover how quickly a school district must act after consent for an evaluation is received, but neither the statute nor regulations seek to set a

---

[6] The federal regulation says the initial evaluation "[m]ust be conducted within 60 days of receiving parental consent for the evaluation; or . . . [i]f the State establishes a timeframe within which the evaluation must be conducted, within that timeframe[.]" 34 C.F.R. § 300.301(c)(1). Texas has established a timeframe, so its timeframe controls.

time between notice of a qualifying disability and referring the student for an evaluation, except that it generally must be done "in a time period comparable to that for students attending public schools . . . consistent with § 300.301." *See* 34 C.F.R. § 300.131(a), (e).

The district court held that a student must be referred for an evaluation within a "reasonable time" after the District has reason to suspect a qualifying disability. This standard is not novel. The Third Circuit has "infer[red] a requirement that" a student must be referred for an evaluation "within a reasonable time after school officials are on notice of behavior that is likely to indicate a disability." *See W.B. v. Matula*, 67 F.3d 484, 501 (3d Cir. 1995), *abrogated on other grounds by A.W. v. Jersey City Pub. Schs.*, 486 F.3d 791 (3d Cir. 2007).

We agree that the reasonable-time standard is appropriate. The child-find duty requires identification *and* evaluation. *See* § 1412(a)(3)(A). If there were no such time requirement, there would be a perverse incentive not to refer disabled children for evaluations, as doing so would stall accrual of a school district's obligations. In other words, "to hold otherwise — to hold that the duty need *not* be discharged within a reasonable time — would eviscerate that duty and thwart the undisputed legislative intent that disabled children be identified, evaluated, and offered appropriate services." *Matula*, 67 F.3d at 501. School districts must seek to evaluate students with suspected disabilities within a reasonable time after the school district is on notice of facts or behavior likely to indicate a disability. *See id.*

Here, the district court correctly concluded that the District had reason to suspect Kelsey had a qualifying disability on September 19 when it received Woody's letter, to which Woody had attached documents detailing Kelsey's disabilities. The district court then concluded that a three-month period of time between this notice and referring Kelsey for an evaluation was

reasonable. This was partly so because the district court found that the delay was not solely attributable to the District.

Indeed, during this period, the District was requesting and gathering information on Kelsey in an effort to classify her and determine its obligations. For example, the District responded to Woody's initial letter by October 4, requesting further information. It took Woody until November 5 to respond. On November 13, the District asked Woody for consent to obtain additional records from LAUSD, which Woody provided on November 19. The District contacted Woody to schedule a meeting on November 18, and the parties agreed to hold the meeting on December 17. Finally, the District referred Kelsey for an evaluation and sought parental consent to evaluate her at that meeting. These facts suggest reasonableness, with neither the District nor the parent reacting with urgency or with unreasonable delay.

The second relevant period concerns the regulatory timelines. Woody provided consent on January 24, which started the timelines for evaluating Kelsey and proposing an IEP. First, the District was required to evaluate Kelsey within 45 school days of receiving consent. *See* § 89.1011(c)(1). Then the District was required to make an IEP decision within 30 days after completing its evaluation. *See* § 89.1011(d). The District argues it provided an FIE to Woody 45 school days after receiving consent (on April 8) and then met to propose an IEP within 30 days (on April 24). Woody does not spend much time arguing otherwise. She does, though, challenge the overall 245-day delay. We certainly agree that the time from start to finish kept Kelsey from receiving meaningful benefits during almost the entire school year. Yet the District is entitled to follow the procedures it did. Absent a finding that it violated some obligation, reimbursement may be calculated only from the date the District should have provided FAPE under the Act.

The district court did conclude there was one significant breach of the District's obligations, which we have already noted. The District provided the initial FIE to Woody on April 8, finding that Kelsey was eligible for services under the IDEA. Then eight days later, the District reversed course and revised the FIE because a psychologist found that Kelsey's success as a "mainstream" student at the Winston School proved she was not IDEA-eligible. The ARD Committee agreed with the District's rejection of providing Kelsey any special-education services. Once a psychologist at Woody's initial expense made an evaluation that was shown to the District, the ARD Committee met again on May 22 and agreed that Kelsey was eligible under IDEA. The new IEP still placed Kelsey in a public high school. That summer, the psychologist completed and submitted an IEE. The ARD Committee did not thereafter reconvene.

Even though the District complied with its obligations to evaluate the student within a reasonable time, its evaluation in April was later found by the District itself to have been incorrect — at least the ARD Committee on May 22 so found. IDEA is not just concerned with school districts acting within a reasonable time in evaluating students. Within a reasonable time, the District must offer appropriate services to a student with a disability. Because the ARD Committee did not reconvene to consider the actual IEE prepared by a psychologist during the summer, however, the district court concluded that the District "never finalized the May 2014 IEP, thereby never finalizing its offer of FAPE." Certainly, had the ARD Committee reconvened, it might still have found private placement to be unnecessary and FAPE was available in a District high school. We conclude that does not matter. The operative question is whether the school offered FAPE within a reasonable time, and it did not.

No. 16-10613

Even so, the district court never explicitly found that the placement at the Winston School in 2013–14 was appropriate.[7] The District does not argue that the Winston School was not a proper placement, but there was no clear finding by the district court with which the District needed to agree or disagree. We have already discussed that there may be "reimbursement for the cost of private special-education services when a school district fails to provide a FAPE and the private-school placement is appropriate . . . ." *Forest Grove*, 557 U.S. at 247. Both are needed.

We uphold the conclusion that FAPE was not offered. Though the district court did not then address whether the Winston School was an appropriate placement, we conclude such a finding is implicit in the district court's holding that Woody was entitled to reimbursement. Whether Winston was appropriate was listed in the district court's pre-trial order as a contested issue of law, but the District does not now argue the district court erred by awarding reimbursement without explicitly concluding the Winston School was an appropriate placement. Nor does it argue the Winston School placement was not appropriate. The state of the briefing here is similar to that in *Michael Z.,* where in a cross-appeal, a party argued the district court erred by not discussing its request for prejudgment interest:

> They ask us to remand for consideration of this issue. However, we conclude that the district court denied their request by not granting prejudgment interest. Since Leah's parents make no argument and cite no authority for the proposition that they could or should recover interest under IDEA, we find that they have waived this argument

*See id.* at 302.[8] Any argument that Winston was not appropriate is forfeited.

---

[7] The hearing officer found the Winston School was an appropriate placement.

[8] "In order for a residential placement to be appropriate under IDEA, the placement must be 1) essential in order for the disabled child to receive a meaningful educational benefit, and 2) primarily oriented toward enabling the child to obtain an education." *Michael*

29

Reimbursement should therefore be awarded from April 24, 2014, when FAPE should have been offered, until the end of the school year.  We use the April 24 date, which is when the District met to propose an IEP, because the district court found the District had acted within a reasonable time in completing its review by April 8, and the April 24 meeting was within 30 days of that date.  It is also the beginning of the period covered by the District's May 22 IEP.  We temporally limit reimbursement in this way because we agree with other courts that we may not reach back to a time before a school district's obligations under the Act accrued.  *See Forest Grove*, 557 U.S. at 247; *Sam K.*, 788 F.3d at 1038–40; *Knable*, 238 F.3d at 771.  Had the District recognized the Winston School as the proper placement on April 8 and thereafter proposed an appropriate IEP at its April 24 meeting, the reimbursement obligation would have started on the latter date.  So although the District failed to recognize the proper private-school placement, that failure does not create a penalty beyond what otherwise would be owed.

\* \* \*

The district court erred by holding that the District was obligated to provide temporary services and by ordering reimbursement of the costs associated with such services.  We REVERSE that portion of its judgment.  We AFFIRM the court's holding that the District failed to make a timely offer of FAPE, thereby making reimbursement an appropriate form of relief.  We

---

*Z.*, 580 F.3d at 299.  The district court found that "[d]uring fall semester 2014, Kelsey was not able to successfully complete the semester without the special education supports she had received at the Winston School."  The court also found that the Winston School was "a small, highly structured, specialized school" that "offers a learning environment for students with learning differences and challenges with very small classes, teaching methods focused on concrete experience, and extra supports."  Woody placed Kelsey at the Winston School for educational reasons at the recommendation of her doctors, and her progress there was judged primarily by educational progress.  Thus, there is certainly evidence that the Winston School placement was both essential and primarily oriented toward enabling Kelsey to obtain an education.

No. 16-10613

REMAND so that the district court can determine the amount of reimbursement owed from April 24, 2014, to the end of the school year.