# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**
November 10, 2025

Lyle W. Cayce
Clerk

————————

No. 25-40010

————————

A.P. by next friend E.P. and D.P.,

*Plaintiff—Appellant*,

*versus*

Pearland Independent School District,

*Defendant—Appellee*.

————————————————————————

Appeal from the United States District Court
for the Southern District of Texas
USDC No. 3:23-CV-358

————————————————————————

Before Jones and Graves, *Circuit Judges*, and Rodriguez, *District Judge*.[*]

Per Curiam:

While a student at Pearland Independent School District, A.P. missed many weeks of class, failed to attend tutorial sessions for extra help outside of class, and took advanced courses against the District's educational advice. Predictably, her grades and test scores fell. Her parents never allowed the District to test A.P. for learning disabilities. The district court found that the

———————————

[*] District Judge for the Southern District of Texas, sitting by designation.

District complied with the Individuals with Disabilities in Education Act ("IDEA"). The judgment is AFFIRMED.

## I.

A.P. spent most of her elementary school years in Pearland Independent School District. From third to fifth grade, A.P. had a good attendance record, passed all her classes, tested average for reading fluency, and passed all but one required state assessment. In sixth grade, A.P. was homeschooled. In seventh grade, A.P. returned to the District. Her attendance began to falter, and A.P. missed more than 10% of her classes. As her attendance faltered, she failed state-mandated exams. The District responded to her failures on the state tests and provided her with targeted intervention during eighth grade. After receiving this extra help, A.P. passed all her classes. However, her attendance issues remained, and she accumulated 25 absences during her eighth-grade year.

The COVID pandemic hit at the end of A.P.'s eighth-grade year, and she began ninth grade remotely. A.P. struggled with attendance as a remote student. She returned to in-person instruction after Thanksgiving. A.P. was enrolled in advanced classes, and she ultimately failed them. The District recommended removing A.P. from her advanced classes and taking on-level classes instead, but her parents refused and decided to leave her in the advanced classes.

During her ninth-grade year, A.P. missed 27 days of Algebra I, 28 days of World Geography, 24 days of Spanish for Native Speakers, 27 days of Biology, and 29 days of Pre-AP English I. At the end of the year, she failed five of her seven classes, passing only Spanish for Native Speakers and Choir. A.P.'s parents continually excused her frequent absences and cited family travel, menstrual cramps, or indigestion as reasons for A.P.'s non-attendance. When asked if he believed that A.P.'s frequent absences

impacted her academic performance, A.P.'s father testified, "of course" they did.

A.P.'s teachers testified that A.P. did not appear to have a disability that affected her reading comprehension, but they were very concerned about her attendance issues. When A.P.'s English teacher, Ms. April Sammons, grew concerned about A.P.'s absenteeism, she contacted A.P.'s counselor and the vice principal to discuss her concerns. Ms. Sammons testified that her reason for reaching out was unrelated to any potential reading disability because A.P. demonstrated the ability to read and comprehend assignments when she attended class.

After ninth grade, A.P. took summer classes to make up for the classes that she failed. During summer school, she passed Algebra I, English I, and Biology.

In tenth grade, the District recommended that A.P. take on-level courses given her academic difficulties. A.P.'s parents declined this recommendation and enrolled A.P. in advanced classes. As A.P. took these challenging classes, her poor attendance continued. She missed 25 days of instruction due to illness or travel out of town with her family. The consistent absences caused her to continue having difficulty in class. A.P.'s teachers did not believe that she had a learning disability since they observed her performing well when she attended class. They attributed her academic failings to her frequent absences and failure to seek out extra help through tutorials.

The District took note of A.P.'s academic struggles and recommended that she enroll in the Alternative Choice for Education ("ACE") program to get the extra help and attention she needed. A.P. applied for and was accepted into the ACE program, but her parents did not permit her to enroll. Additionally, at the end of the fall semester, discussions

between the District and A.P.'s father broke down when he canceled a meeting with her school counselor and never rescheduled. In February 2022, during A.P.'s tenth-grade year, her parents withdrew her from the District and began homeschooling.

In September 2022, A.P.'s parents filed a due process hearing request and informed the District that they suspected that A.P. had dyslexia. A.P.'s parents and the District met for mediation on October 4. On October 6, the District offered to conduct a full individual initial evaluation of A.P., but A.P.'s parents refused to consent to the testing. Instead, months later and at the request of their attorney, A.P.'s parents had her undergo an independent evaluation by neuropsychologist Dr. Michael Roman. Dr. Roman determined that A.P. does not have ADHD or dyslexia but she does have learning disabilities in reading comprehension, math computation, and math reasoning. Dr. Roman's report did not include teacher information or classroom observation. The District received the report and scheduled a committee meeting to consider an Individualized Education Plan for A.P. A.P.'s parents did not attend the committee meeting. During the meeting, the District determined that it did not have enough information to assess A.P.'s eligibility under IDEA because Dr. Roman's report lacked necessary information about A.P.'s performance in the school setting.

In June 2023, A.P.'s parents and the District attended a hearing. At the hearing, holes emerged in Dr. Roman's report and cast doubt on his findings. For instance, Dr. Roman did not know that he was missing grades and test scores for A.P.'s sixth-grade year because she had been homeschooled that year. Dr. Roman did not observe A.P. in a classroom, collect information from teachers, or review A.P.'s work samples, which he opined were not helpful. Additionally, Dr. Roman did not review or consider data related to A.P.'s attendance and was unaware of her attendance problems. This omission particularly undermined his credibility, since Dr.

Roman also testified that "the importance of attendance is a given. If you're not there to benefit from instruction, it becomes an issue."

Following the hearing, the Special Education Hearing Officer issued an order on July 28, 2023, finding that A.P. failed to prove that the District violated IDEA. A.P.'s parents filed an appeal in the district court on October 26, 2023, pursuant to 20 U.S.C. § 1415(i)(2). Both parties filed motions for summary judgment. The district court upheld the Special Education Hearing Officer's decision and granted summary judgment for the District. The district court found that the District satisfied its child find obligation, A.P. did not qualify for special education, and A.P.'s educational issues were primarily linked to her poor attendance record.

A.P.'s parents timely appealed.

## II.

This court reviews *de novo* mixed questions of law and fact. *Cypress-Fairbanks Indep. Sch. Dist. v. Michael F. ex rel. Barry F.*, 118 F.3d 245, 252 (5th Cir. 1997). The district court's fact findings are reviewed for clear error. *Id.* A fact finding is clearly erroneous when this court has a "a definite and firm conviction that a mistake has been committed." *Anderson v. City of Bessemer City, N.C.*, 470 U.S. 564, 565, 105 S. Ct. 1504, 1507 (1985) (quoting *United States v. United States Gypsum Co.*, 333 U.S. 364, 395, 68 S. Ct. 525, 542 (1948)).

## III.

The first issue raised by A.P. on appeal is whether the District satisfied its child find obligation. The second issue is whether A.P. qualifies for special education services.

No. 25-40010

a.

IDEA mandates "states and local educational agencies receiving federal IDEA funds to make a [free and appropriate public education ("FAPE")] available to children with certain disabilities between the ages of 3 and 21." *Pace v. Bogalusa City Sch. Bd.*, 403 F.3d 272, 290 (5th Cir. 2005) (en banc). IDEA advances its policy goals by imposing on states a child find obligation. Child find requires a state to "identify, locate, and evaluate all children with disabilities residing in the State to ensure that they receive needed special-education services." *Forest Grove Sch. Dist. v. T.A.*, 557 U.S. 230, 245, 129 S.Ct. 2484, 2495 (2009) (internal quotation marks and brackets omitted) (quoting 20 U.S.C. § 1412(a)(3)(A)).

The child find duty is triggered "after the school district is on notice of facts or behavior likely to indicate a disability." *Dall. Indep. Sch. Dist. v. Woody*, 865 F.3d 303, 320 (5th Cir. 2017). Once a school district is on notice, it must "identify, locate, and evaluate students with suspected disabilities within a reasonable time." *Krawietz ex rel. Parker v. Galveston Indep. Sch. Dist.*, 900 F.3d 673, 676 (5th Cir. 2018) (internal quotation marks and citation omitted). "A child find violation turns on three inquiries: (1) the date the child find requirement triggered due to notice of a likely disability; (2) the date the child find duty was ultimately satisfied; and (3) the reasonableness of the delay between these two dates." *Spring Branch Indep. Sch. Dist. v. O.W. ex rel. Hannah W.*, 961 F.3d 781, 793 (5th Cir. 2020).

The parties agree that the District satisfied its child find obligation in October 2022 when it initiated an evaluation process. However, they disagree as to when the obligation was triggered. The District argues that the child find duty was triggered by A.P.'s parents' request for a due process hearing in September. A.P.'s parents contend, however, that the duty was triggered much earlier by (1) A.P.'s chronic absenteeism, (2) A.P.'s poor

No. 25-40010

academic record, and (3) Ms. Sammons's reaching out to A.P.'s counselor and vice principal.

i.

A.P.'s attendance record, while poor, did not trigger the District's child find duty. A.P.'s parents argue that her attendance record is sufficiently bad that it should have independently triggered the District's child find duty. A.P.'s parents cite a litany of cases relevant to their contention that attendance alone can raise a child find duty. *See, e.g., A.P. v. Pasadena Unified Sch. Dist.*, No. CV 19-7965-MWF (SSX), 2021 WL 810416, at *8 (C.D. Cal. Jan. 26, 2021) (holding that the child find duty was "undoubtedly triggered . . . once [a] [s]tudent began to miss school with alarming frequency."). *Pasadena* can be easily distinguished. In that case, the school district was on notice about the student's diagnosed social anxiety disorder and depression, and the student's mental health struggles were the reason for her poor attendance. *Id.* at *6. Here, there is no allegation that A.P. suffers any sort of mental health condition. To the contrary, Dr. Roman's report found that A.P. had no psychological disorders. The other cases cited by A.P. fare no better. In each of the cited cases where courts found a child find violation linked with poor attendance, the student also experienced behavioral, medical, or psychological problems that were known to the school district. *See Culley v. Cumberland Valley Sch. Dist.*, 758 F. App'x 301, 302 (3d Cir. 2018) (school was on notice due to student's 43 absences, significant behavioral issues, and Crohn's disease diagnosis); *Malloy v. District of Columbia*, No. 20-CV-03219 (DLF), 2022 WL 971208, at *2 (D.D.C. Mar. 30, 2022) (school was on notice due to student's 65 absences and poor behavior); *Rayna P. v. Campus Cmty. Sch.*, No. CV 16-63, 2018 WL 3825893, at *2–3 (D. Del. Aug. 10, 2018) (school was on notice when student accumulated 233 absences over three years and had documented health issues); *SPB v. Washoe Cnty. Sch. Dist.*, No. 3:22-CV-00340-ART-CLB,

2024 WL 4368227, at *14 (D. Nev. Sept. 30, 2024) (school was on notice when it had knowledge of "student's severe psychological condition" and "lack of attendance.").

Unaccompanied by evidence of behavior issues, psychological problems, or serious health concerns, A.P.'s absences were insufficient to trigger the District's child find obligation. A.P.'s parents frequently excused her absences for reasons such as family travel or benign medical issues. These types of absences were insufficient to put the District on notice. That a student's absenteeism results in an educational impediment is simply not the same as the student's suffering mental or cognitive problems that created a learning disability. Moreover, to hold otherwise could require a school district to be skeptical of parents making accepted excuses for their child's absences. Such a result would create unnecessary friction and waste administrative resources.

ii.

A.P.'s poor academic record was also insufficient to trigger the District's child find obligation. Poor grades do not require schools to "rush to judgment or immediately evaluate every student exhibiting below-average capabilities." *Spring Branch*, 961 F.3d at 794 (quoting *D.K. v. Abington Sch. Dist.*, 696 F.3d 233, 252 (3d Cir. 2012)). Additionally, "mixed academic success does not—in itself—trigger a school district's obligation to evaluate." *Leigh Ann H. v. Riesel Indep. Sch. Dist.*, 18 F.4th 788, 797 (5th Cir. 2021).

The record does not support that A.P.'s poor grades created a child find duty. Against the District's sound academic advice, A.P. enrolled in advanced courses meant for exceptionally bright and diligent students. Her teachers noted that she had the capability to understand academic concepts and do the work when she was attending class consistently. However, she

ultimately struggled in these courses and received poor overall grades. Her teachers did not suspect a disability and instead thought the reason for her academic failure was her inconsistent attendance record. When assessing IDEA claims, it is important to give due weight to teacher testimony regarding the student's academic performance. *See Alvin Indep. Sch. Dist. v. A.D. ex rel. Patricia F.*, 503 F.3d 378, 384 (5th Cir. 2007) (affirming a district court's fact finding that a teacher's testimony regarding a student's educational success in school is more probative than testimony from a student's physician). A.P.'s teachers found that she could achieve academic success when she was in class, and they believed that she fell behind due to her inconsistent attendance. Faced with a mixed academic record and severe absenteeism, the District did not violate its child find obligation by attributing A.P.'s academic failures to attendance problems.

iii.

A.P.'s parents contend that the "most consequential" evidence of a child find violation is Ms. Sammons's testimony that she contacted A.P.'s counselor and vice principal to discuss her concerns about A.P.'s poor academic performance and poor attendance. When asked whether she believed that A.P. suffered from a learning disability, Ms. Sammons unequivocally replied, "no." Based on her experience working with A.P., Ms. Sammons testified that when A.P. attended class "she was on top of it," "knew what she was reading," and "understood what was happening." In Ms. Sammons's opinion, A.P.'s academic issues were caused by her poor attendance record. As noted above, teacher testimony regarding a student's academic performance is granted substantial weight in IDEA proceedings, and the Special Education Hearing Officer and the district court did not err by relying on her persuasive testimony. *Alvin Indep. Sch. Dist.*, 503 F.3d at 384.

\*

Taken together or singly, A.P.'s absenteeism, poor grades, and Ms. Sammons's effort to address A.P.'s attendance issues did not trigger the District's child find duty. Therefore, the earliest the child find duty could have arisen was when A.P.'s parents informed the District that they were concerned that she may have dyslexia. After receiving this information, the District acted promptly to satisfy its child find duty and tried to test A.P. for a learning disability. But A.P.'s parents refused to consent to the testing.

Even if the District had violated its child find duty, the District still would not have denied A.P. a FAPE since "procedural defects alone do not constitute a violation of the right to a FAPE unless they result in the loss of an educational opportunity." *Adam J. ex rel. Robert J. v. Keller Indep. Sch. Dist.*, 328 F.3d 804, 812 (5th Cir. 2003) (quoting *T.S. v. Indep. Sch. Dist. No. 54*, 265 F.3d 1090 (10th Cir. 2001)). Since, as demonstrated below, A.P. does not qualify for special education services, the District cannot be penalized for alleged procedural errors in evaluating her eligibility for an IDEA program.

b.

To receive special education services, "a student must both: (1) have a qualifying disability and (2) 'by reason thereof, need[ ] special education and related services.'" *Alvin Indep. Sch. Dist.*, 503 F.3d at 382 (quoting 20 U.S.C. § 1401(3)(A)). In assessing a student's need for special education, a school district "must conduct a 'full and individual evaluation' following statutorily prescribed standards." *Id.* (quoting 20 U.S.C. § 1414(a)(1)(A)).

Before finding a student eligible for academic support through IDEA, school districts must conduct testing that accords with strict parameters. A school district is prohibited from finding that a child has a disability "[i]f the determinant factor for that determination is [l]ack of appropriate instruction in reading . . . [or] math." 34 C.F.R. § 300.306(b)(1). Additionally, as part

of IDEA-related assessments, schools must evaluate "all areas related to the suspected disability, including, if appropriate, health, vision, hearing, social and emotional status, general intelligence, academic performance, communicative status, and motor abilities." 34 C.F.R. § 300.304(c)(4). As part of the evaluation, school districts must also consider "classroom-based observations" and "observations by teachers." 20 U.S.C. § 1414(c)(1)(A).

In contrast to the strict evaluation procedures required under IDEA, Dr. Roman's report did not include vision testing, classroom-based observations, or observations by teachers. Additionally, his report did not consider whether A.P. suffered a "lack of appropriate instruction" in math and reading due to her consistent absences. Indeed, Dr. Roman did not even know that A.P. had a long record of attendance problems. Dr. Roman's failure to investigate A.P.'s attendance record is inexplicable given his testimony that "the importance of attendance is a given. If you're not there to benefit from instruction, it becomes an issue." Given the inadequacy of Dr. Roman's report, the District reasonably determined that it did not have sufficient evidence to determine A.P.'s IDEA eligibility. The District tried to rectify this inadequacy and offered to test A.P., but A.P.'s parents refused to grant consent. Additionally, A.P.'s parents did not attend the District's Individualized Education Plan meeting.

Without parental participation in the evaluation process or permission to test A.P., the district court considered all available evidence and made a reasonable determination that A.P. did not qualify under IDEA. The district court considered the testimony of many teachers who observed A.P. in class and testified that her academic challenges stemmed from her poor attendance. In this case, "[t]he district court is certainly capable of assessing the individual circumstances . . . and evaluating the credibility" of A.P.'s teachers who have had "greater contact" with her than Dr. Roman. *Christopher M. ex rel. Laveta McA. v. Corpus Christi Indep. Sch. Dist.*, 933 F.2d

No. 25-40010

1285, 1292 (5th Cir. 1991). The district court did not err in relying on "A.P.'s teachers' informed opinions" and finding that Dr. Roman's evaluation was "inadequa[te]."

When a student is not receiving "appropriate instruction" because poor attendance caused the student's substandard academic achievement, the IDEA regulations expressly contemplate that a school district may not find the student is disabled. 34 C.F.R. § 300.306(b)(1). Because A.P.'s consistent absences prevented her from receiving appropriate instruction, the district court did not err in determining that her parents failed to prove that she qualifies under IDEA.

For the foregoing reasons, the judgment of the district court is AFFIRMED.