# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

November 22, 2021

Lyle W. Cayce
Clerk

No. 20-50003

LEIGH ANN H., *as parent, guardian, and next friend of K.S., and K.S. individually, an individual with a disability*,

*Plaintiff—Appellant*,

*versus*

RIESEL INDEPENDENT SCHOOL DISTRICT,

*Defendant—Appellee*.

Appeal from the United States District Court
for the Western District of Texas
USDC No. 6:17-CV-210

Before ELROD, DUNCAN, and WILSON, *Circuit Judges*.

JENNIFER WALKER ELROD, *Circuit Judge*:

This case arises out of the Individuals with Disabilities in Education Act (IDEA) and its associated regulations. The idea behind IDEA is that every student, regardless of disability, is entitled to a free and appropriate public education.[1] Leigh Ann H. and her now-adult son K.S., a former high school student with a specific learning disability, brought this case

---

[1] *See* 20 U.S.C. § 1400(d)(1)(A).

No. 20-50003

contending that the Riesel Independent School District (RISD) neither provided K.S. with a free appropriate public education nor complied with procedural safeguards meant to ensure such. They appeal the district court's affirmance of two administrative decisions concluding that RISD did not violate IDEA's substantive and procedural requirements.[2] Having carefully reviewed the voluminous record and the magistrate judge's thorough report that the district court adopted, we affirm.

I.

K.S. navigated elementary and high school in RISD with mixed academic success and a checkered disciplinary record. Apart from third grade, which he completed at Marlin Elementary School, K.S. attended school within RISD for his entire education. This case emerged from K.S.'s identification and accommodation as a student with disabilities during his RISD high school career, but some details from his elementary school days are necessary to understand the claims presented here on appeal.

---

[2] Although the parties' briefs, the record on appeal, our caselaw, and even IDEA itself contain an alphabet soup of administrative acronyms, we will spell things out for the sake of clarity. *E.g.*, 20 U.S.C. § 1414(d)(1)(A)(i) (referring to an "individualized education program" as an "IEP"); Appellants' Br. (using no fewer than twenty-two unique initialisms); Appellee's Br. (similar). Given their frequency and intelligibility, we nonetheless will continue to abbreviate IDEA and RISD.

For those who prefer acronymic efficiency, however, our holding is roughly as follows: RISD did not violate IDEA with respect to K.S. because, as the SEHOs correctly found at the DPHs: (1) the ARDC's IEPs for K.S., which included PLAAFP statements, TEKS goals for K.S.'s grade level, various accommodations, and a transition plan, were appropriately individualized in light of K.S.'s SLD; and (2) no actionable violation resulted from wrongly excluding K.S. from the Sept. MDR, which reviewed K.S.'s prior FIEs, FBA consultations, his IIE, Ms. H.'s reports of K.S.'s ADHD (an OHI), TBI, and mood disorders, and concluded that K.S's SLD did not cause him to commit the assault for which he was assigned to DAEP. And, in sum, the D. Ct. did not err in holding that K.S. received a FAPE in the LRE in compliance with IDEA.

While attending third grade at Marlin, K.S. began to get into trouble. His mother, Leigh Ann H., sought out a private psychologist, Dr. Finlay, to evaluate K.S. Dr. Finlay reported that K.S. was in the "middle part of the average range of intellectual functioning," but that there were "possible learning disabilities in reading and written expression." Dr. Finlay further concluded that K.S.'s "score patterns were not consistent with a child with [attention deficit hyperactivity disorder] and, therefore, the test results suggest[ed] that his problems in school [we]re more mood related and probably associated with learning disabilities." He recommended that K.S. should be "considered for special education services for learning disability and possibly emotional disturbance." Dr. Finlay's report, however, was not provided to RISD until March of 2016, by which point K.S. was in eleventh grade.

When K.S. returned to RISD in the fourth grade, he did not stand out academically. His grades and standardized test scores were generally middling, and he did not fail consistently in any one subject, let alone across the board. Indeed, K.S. passed *all* of his middle-school classes with average to above-average grades. He passed his State of Texas Assessment of Academic Readiness exams in reading, math, writing, and science as a fourth and fifth grader. And although he narrowly failed the state standardized exams for sixth-grade reading, seventh-grade writing, and eighth-grade social studies, K.S. subsequently passed both his seventh- and eighth-grade reading tests—with his score on the latter nearly earning him "Advanced" achievement status.

Come high school, K.S.'s mixed academic track record continued. In ninth grade, K.S. failed Biology I and Algebra I but passed the standardized state exams in both subjects. Inversely, he initially failed his English I and II standardized exams by a few points (he later passed) while passing his corresponding ninth- and tenth-grade high school courses. Besides tenth-

grade World Geography and a semester of Geometry, K.S. otherwise passed his high school classes and other state standardized assessments.

K.S.'s behavior in high school was substandard. His freshman year, K.S. received a suspension for refusing to do his work, swearing repeatedly at a teacher, and punching a wall. This resulted in a thirty-day stay at RISD's disciplinary alternative education placement center. In the tenth grade, he received twenty-six disciplinary referrals: ten for tardiness, six for failure to follow directions, four for rudeness or profanity, three for failure to turn in work, one for disrupting class, one for being in detention hall too many times, and one for chewing tobacco on school property. The next year, however, his disciplinary referrals dropped to just two (at least, as of March of his 2017 spring semester).

In March of 2016, at Ms. H.'s request, RISD referred K.S. for a full individual and initial evaluation. Ms. H. noted on her referral form that she was making the request due to K.S.'s "struggles with math" and "behavioral outburst[s] when angry." RISD finished its evaluation about eight weeks later. The forty-page report summarizing RISD's findings concluded that K.S. met the special education criteria for specific learning disabilities in math calculation and math problem solving, as well as in reading fluency— an area of difficulty that Ms. H. had not mentioned. RISD's diagnostician did not consider it necessary to evaluate K.S. for an emotional disturbance.

Following K.S.'s initial evaluation, RISD held an Admission, Review, and Dismissal Committee meeting to develop an individualized education program for K.S. The resultant program provided goals to achieve grade-level performance in both math and English and a number of accommodations for K.S. in both courses, including changing the pace of instruction and having teachers clarify complex concepts to suit his needs. RISD assigned a case worker to consult with his teachers for at least fifteen

minutes each grading period, although actual consultations proved considerably more extensive. The education program also contained a transition plan that highlighted K.S.'s goals of attending college, pursuing a degree in criminal justice, and ultimately, becoming a game warden.

Ms. H. was dissatisfied with RISD's assessment and concerned that her son was not receiving the accommodations required by his individualized education program. She filed a request in December for a due process hearing, and the school promptly responded by seeking a reevaluation of K.S. In January of 2017, before the next evaluation, K.S. received an in-school suspension for losing his temper, swearing, and slamming the door when a teacher tried to take his cell phone away. Over the next couple of months, RISD evaluated K.S. for a second time but did not conduct a behavioral assessment because his behavior was considered "well within the average range." This evaluation resulted in a new individualized education program which replicated the 2016 program but added an adjusted goal for K.S. to achieve grade-level performance in mathematics.

A month later, in preparation for the due process hearing, Ms. H. hired Dr. Lesli Doan to conduct a psychoeducational evaluation of K.S. Dr. Doan concluded that, in addition to his current specific learning disabilities, K.S. should be found eligible for special education in reading fluency and comprehension, written expression, and potentially oral expression and listening comprehension. Her report further suggested that K.S. met the eligibility requirements for an "Other Health Impairment" due to K.S.'s attention deficit hyperactivity disorder and behavioral issues at school.

Ms. H. also procured the opinion of a certain Dr. Bruce Bloom in preparation for the impending hearing. Dr. Bloom based his report on an interview with Ms. H. and K.S.'s academic records but did not meet with K.S. prior to issuing the report. His report criticized K.S.'s individualized

No. 20-50003

education program for its allegedly inadequate accommodations, unrealistic goals, and insufficiently supported, unrealistic long-term transition plan.

In May of 2017, the school called another committee meeting to reassess K.S.'s program but ultimately recommended no changes at that time. When Ms. H. voiced her disagreement, the committee reconvened in June and agreed to add fifteen minutes of specialized instruction in reading fluency, two days per week.

Just weeks after K.S.'s eighteenth birthday, an incident occurred on school grounds for which he was charged with assault, a Class A misdemeanor. K.S. was banned from school grounds, and RISD sought to place him in the disciplinary education center for forty days once the school year began. Eight days after the assault, Principal Brandon Cope contacted K.S. and his mother to schedule a manifestation determination review. K.S. did not attend the resultant August meeting because of the "no trespass" order that remained in effect. The meeting's purpose was to determine whether K.S.'s behavior resulted from his learning disabilities. All attendees besides Ms. H. concluded that the assault was not connected to his specific learning disabilities in math and English and recommended that K.S. be sent to the disciplinary education center.

Barely a week later, on September 1, a second manifestation determination review took place. This time, K.S. attended. The attendees revisited the previous meeting's discussion and its conclusion that the assault was "not a manifestation of [K.S.]'s learning disability and not a failure of the district to implement [his individualized education program] since school was not in session." All committee members "were given the opportunity to express concerns and offer input." Ms. H. and K.S. disagreed.

At the same September meeting, Ms. H. and K.S. indicated that they wanted K.S. to graduate early. They requested a major scheduling change:

6

K.S. would complete two whole senior-level courses—English IV and Government/Economics—from the disciplinary education center in order to fulfill his graduation requirements. In so doing, K.S. would receive the Texas foundational diploma without an endorsement, which would allow him to graduate early but would also render him unable to enroll directly in a public Texas university. RISD approved this request, and K.S. began his final year at the disciplinary center. There, he reportedly accomplished a herculean feat: He completed all of his required coursework—two full courses' worth—in a mere five days.

In their initial December 2016 request for a due process hearing, Ms. H. and K.S. complained that RISD had failed (1) to properly identify and evaluate K.S., (2) to provide K.S. a free and appropriate public education, (3) to provide prior written notice, and (4) to educate K.S. in the least restrictive environment. That hearing was held in May of 2017 before a special education hearing officer who found in favor of RISD on all counts. In August, Ms. H. and K.S. appealed the administrative decision in the United States District Court for the Western District of Texas.

The following month, after RISD had conducted K.S.'s September manifestation determination review, Ms. H. and her son filed a request for a second due process hearing to challenge the substantive and procedural adequacy of the manifestation determination review under IDEA. When the second special education hearing officer again ruled in favor of RISD, Ms. H. and K.S. returned to the district court. The district court consolidated the two appeals, and appellants moved to include additional evidence, which the district court denied. The magistrate judge issued a report recommending judgment on the administrative record in favor of RISD, and the district court adopted this recommendation in full. Appellants timely appealed to this court. They seek compensatory education for K.S. on account of RISD's

alleged IDEA violations, as well as reimbursement for Dr. Doan's private evaluation.

## II.

IDEA litigation invariably involves an inextricable tangle of law and fact. Our review, accordingly, is *de novo. Krawietz ex rel. Parker v. Galveston Indep. Sch. Dist.*, 900 F.3d 673, 676 (5th Cir. 2018). Unless we perceive clear error in the district court's underlying factual findings, we will not reverse. *R.P. ex rel. R.P. v. Alamo Heights Indep. Sch. Dist.*, 703 F.3d 801, 808 (5th Cir. 2012); *see also Klein Indep. Sch. Dist. v. Hovem*, 690 F.3d 390, 395 (5th Cir. 2012). We encounter clear error only when "we are 'left with a definite and firm conviction that a mistake has been committed.'" *R.P.*, 703 F.3d at 808 (quoting *Hou. Indep. Sch. Dist. v. V.P. ex rel. Juan P.*, 582 F.3d 576, 583 (5th Cir. 2009)).

## III.

Leigh Ann H. and K.S. raise a raft of complaints concerning the magistrate judge's report and recommendation as adopted by the district court. All are unavailing.[3] Their chief complaints center on the district court's holdings that:

---

[3] Three objections can be dispatched forthwith. First, appellants allege that the district court erroneously denied their motion to introduce post-hearing evidence. Assuming *arguendo* that appellants preserved this issue and that their contention has merit, appellants nevertheless fail to explain how any substantial right was affected by the exclusion of this evidence. *See E.R. ex rel. E.R. v. Spring Branch Indep. Sch. Dist.*, 909 F.3d 754, 763–64 (5th Cir. 2018).

Second, appellants complain that the district court (in adopting the magistrate judge's report) erroneously declined to consider the administrative record from one of their appeals as to the other, even though the appeals were consolidated. But the district court did not abuse its discretion in refusing to treat the consolidated appeals as if they were consolidated for all purposes. *Green v. Polunsky*, 229 F.3d 486, 488 (5th Cir. 2000) ("We review a district court's decision regarding the consolidation of cases for abuse of

No. 20-50003

> (1) RISD did not violate its obligation to identify and evaluate K.S. as a student with a suspected disability;
>
> (2) The individualized education programs and transition plan created for K.S. complied with IDEA's substantive requirements; and
>
> (3) RISD's procedural foot-faults in failing to include K.S. for the first manifestation determination review and failing to consider certain relevant information were not actionable.

We discern no reversible error. As the magistrate judge (and district court) properly found, appellants did not meet their burden of proof in administrative proceedings below to establish that RISD committed actionable IDEA violations. *See Schaffer ex rel. Schaffer v. Weast*, 546 U.S. 49, 62 (2005) ("The burden of proof in an administrative hearing challenging a[] [school district's IDEA compliance] is properly placed upon the party seeking relief."); *see also Cypress-Fairbanks Indep. Sch. Dist. v. Michael F. ex rel. Barry F.*, 118 F.3d 245, 253 (5th Cir. 1997) ("[A] party attacking the appropriateness of an [individualized education program] ... bears the burden of showing why [it was] ... inappropriate under the IDEA.").

---

discretion."). Indeed, it can hardly be an abuse of discretion to follow the traditional default rule that "consolidation [does] not ... completely merg[e] the constituent cases into one, but instead ... enabl[es] more efficient case management while preserving the distinct identities of the cases." *Hall v. Hall*, 138 S. Ct. 1118, 1125 (2018); *see also, e.g.*, *The Martha*, 53 U.S. 347, 353 (1851) ("[A]lthough the proceeding assumes the form of a joint suit, it is in reality a mere joinder of distinct causes of action ....").

Finally, appellants argue alternatively that if their appeals remained distinct (despite consolidation for judicial efficiency), the district court should have issued two separate orders. Even if there were merit to this contention, appellants fail to show any resultant harm warranting reversal. *See Cabral v. Brennan*, 853 F.3d 763, 766 (5th Cir. 2017).

9

No. 20-50003

A.

IDEA obligates public school districts to "identify, locate, and evaluate students with suspected disabilities 'within a reasonable time after the school district is on notice of facts or behavior likely to indicate a disability.'"[4] *Krawietz*, 900 F.3d at 676 (quoting *Dall. Indep. Sch. Dist. v. Woody*, 865 F.3d 303, 320 (5th Cir. 2017)); 20 U.S.C. § 1412(a)(3)(A). Once a school district suspects that a student suffers a disability, it must evaluate him for "all areas related to the suspected disability." 34 C.F.R. § 300.304(c)(4). The record in this case does not disclose any clear indication that the district court erred in concluding that RISD did, in fact, fulfill these duties.

Appellants urge us to overrule the district court's factual finding that RISD had no reason to suspect K.S.'s disability before Ms. H. requested that her son be evaluated in March of 2016.[5] We see no reason to do so. So far as the record shows, Ms. H. neither "expressed concern in writing to supervisory or administrative personnel" or "a teacher of [K.S.]" nor formally "requested an evaluation of [K.S.]" before March 22, 2016. 20 U.S.C. § 1415(k)(5)(B)(i)–(ii). And, as the magistrate judge reasonably determined, none of K.S.'s teachers or other RISD personnel "expressed specific concerns about a pattern of behavior demonstrated by [K.S.], directly to the director of special education . . . or to other supervisory personnel" before Ms. H. requested K.S.'s initial assessment. *Id.* § 1415(k)(5)(B)(iii).[6]

---

[4] In disability-law vernacular, this legal obligation has been dubbed (somewhat inartfully) the "child find" duty. *See* 20 U.S.C. § 1412(a)(3).

[5] *Cf. Spring Branch Indep. Sch. Dist. v. O.W. ex rel. Hannah W.*, 961 F.3d 781, 794 (5th Cir. 2020), *cert. denied*, 141 S. Ct. 1389 (2021) ("[D]etermining whether a child find violation occurred is a fact-intensive inquiry . . . .").

[6] Appellants correctly observe that these § 1415(k)(5)(B) factors are listed within the statutory context of procedural safeguards applicable to disciplinary action involving

Indeed, just eight weeks after Ms. H.'s request, RISD duly completed a full individual evaluation of K.S. and produced a forty-page report detailing the results.

Appellants have not argued—let alone proven—that the eight weeks between Ms. H.'s request and RISD's completion of K.S.'s timely evaluation constituted unreasonable delay.[7] Instead, they argue that RISD was on notice that K.S. might have been suffering from a disability "long before" Ms. H.'s request. They do not contest the facts recited in the magistrate judge's report. Nevertheless, appellants assert that the weight of the evidence shows that "K.S. displayed a combination of academic failures and behavioral outbursts over the course of many years," which ought to have prompted RISD to investigate earlier than it did. We are not convinced.

It was only in 2016, during K.S.'s initial assessment, that RISD received Dr. Finlay's 2009 private evaluation of K.S. as a third grader at

---

students with disabilities of which school districts are "deemed to have knowledge." The legal trigger for the "child find" obligation under § 1412(a)(3) is indeed reasonable suspicion. *See Krawietz*, 900 F.3d at 676. Nevertheless, the § 1415(k)(5)(B) criteria provide sensible starting points for this analysis: If a parent or teacher raises concerns about a student's behavior that might suggest a disability such that a school district would be "deemed to have knowledge that the child is a child with a disability" for purposes of disciplinary proceedings under § 1415(k), *a fortiori* the school district would also have reasonable suspicion that would trigger its child find duty under § 1412(a)(3).

The magistrate judge's report reflects this same line of reasoning. The report first addresses the § 1415(k) factors to determine whether RISD was on notice of K.S.'s disability. Then, the report evaluated appellants' arguments that RISD "had reason to suspect that K.S. had a disability." The district court committed no error in adopting this analysis as its own.

[7] Nor could they. Under Texas law, the district is to complete a full and individual evaluation "not later than the 45th *school day* following the date on which the school district receives written consent for the evaluation . . . ." 19 Tex. Admin. Code § 89.1011(c)(1) (emphasis added); *see also* 34 C.F.R. § 300.301(c)(1) (authorizing states to establish a timeframe for initial evaluation). RISD did so.

another school district. Appellants do not suggest otherwise. They submit, though, that the Finlay report evidences "school-related events" that "happened at RISD" of which RISD should have been aware.

The Finlay report is equivocal at best. For one thing, the report confuses where K.S. was attending school at the time: In the same paragraph, it states both that K.S. "is in danger of getting kicked out of school at Reisal [sic] where he attends third grade" and that he "does not make friends well in Marlin School where he is attending [sic]." Dr. Finlay also notes that K.S. "has had more problems this year [i.e. third grade at Marlin] than previous years in school" and that he "[r]eportedly . . . had a sudden change in his behavior at school when he started school in Marlin." Both statements plainly belie appellants' characterization of the report as bearing on "events [that] happened at RISD."

Setting aside the Finlay report, appellants allege that K.S.'s "behavior and academics were a concern prior to the initial [evaluation]." Even if we were to entertain appellants' attempt on reply to breathe life into their initial brief's conclusory assertion as to concerns about K.S.'s academic track record,[8] we still spot no error here.

K.S. was an average student. He did not founder perennially in any given discipline—let alone across the board. After K.S.'s evaluation, RISD concluded that he had specific learning disabilities in reading fluency, math comprehension, and math problem solving. His educational record prior to RISD's 2016 evaluation displays no consistent pattern of failure that would have put RISD on notice as to K.S.'s disability in reading or mathematics— or, for that matter, a potential learning disability in any other subject.

---

[8] *Herrmann Holdings Ltd. v. Lucent Techs., Inc.*, 302 F.3d 552, 562 n.2 (5th Cir. 2002) ("We do not generally consider points presented for the first time in a reply brief.").

No. 20-50003

For instance, although K.S. had failed a semester of his ninth-grade algebra course, he succeeded in passing the Texas state standardized algebra exam. With the exception of biology, a subject in which he was not found to have a specific learning disability and in which he also passed the standardized test, he had been passing all of his other classes. Indeed, K.S.'s classwork earned him a passing grade in his ninth-grade RISD English courses, even though he had to retake the state exam several times before passing. His coursework and standardized testing in elementary school was similarly mixed. And mixed academic success does not—in itself—trigger a school district's obligation to evaluate.[9]

Nor does disciplinary history. Behavioral issues do not *ipso facto* signify a disability. For this reason, other courts have held—and we agree— that delinquency does not necessarily give rise to a reasonable suspicion of emotional disturbance that would require evaluation under IDEA and its regulatory framework.[10]

---

[9] *Cf. Krawietz*, 900 F.3d at 675–77 (upholding an administrative determination that "[a student's] academic decline, hospitalization, and incidents of theft . . . —*taken together*—were *sufficient* to cause [a school district] to suspect that her several disabilities created a need for special education services" (emphases added) (quoting the special education hearing officer)). Notably, in *Krawietz*, the student had been "failing *most* of her classes," she "performed poorly on the PSAT," and she had "completed fewer than half of her expected credits" for a semester before the school district eventually evaluated her. *Id.* at 675 (emphasis added). Here, by contrast, K.S.'s academic performance did not indicate consistent, specific deficiencies in any particular discipline—let alone most of them—that would have suggested to the reasonable observer a possible disability.

[10] *See, e.g.*, *D.K. v. Abington Sch. Dist.*, 696 F.3d 233, 250–51 (3d Cir. 2012) (refusing to hold that "misbehavior denoted a disability or disorder because hyperactivity, difficulty following instructions, and tantrums are not atypical"); *Springer v. Fairfax Cnty. Sch. Bd.*, 134 F.3d 659, 664 (4th Cir. 1998) ("Courts and special education authorities have routinely declined . . . to equate conduct disorders or social maladjustment with serious emotional disturbance." (citing authorities)); *Tracy v. Beaufort Cnty. Bd. of Educ.*, 335 F. Supp. 2d 675, 689 (D.S.C. 2004) ("[T]he mere fact that [a student] engaged in delinquent behavior did not put the School District on notice that he possibly was suffering from a serious emotional

No. 20-50003

Appellants point to K.S.'s disciplinary record as evidence that RISD was aware that K.S. might have suffered from a "serious emotional disturbance," which IDEA regulations classify as a disability, and for which RISD would have had to evaluate K.S. 34 C.F.R. § 300.8(a)(1); *id.* § 300.304(c). K.S. did have twenty-six disciplinary referrals during his tenth-grade year. But appellants never explain how *any* of these referrals—most of which were merely for tardiness or failure to follow directions—relate to the regulatory definition of an emotional disturbance. *See id.* § 300.8(c)(4) (defining "[e]motional disturbance" by reference to a set of five characteristics, any one or more of which must be exhibited "over a long period of time and to a marked degree that adversely affects a child's educational performance"). Because appellants fail to show how K.S.'s disciplinary record would give rise to a reasonable suspicion that K.S. had an emotional disturbance, we cannot say that RISD violated a duty to identify and evaluate K.S. as a student with a potential emotional disturbance.

In sum, the district court did not err in finding that appellants failed to carry their burden of proof: They have not sufficiently shown that RISD unreasonably tarried in evaluating K.S. for any reasonably suspected disability.

B.

Under IDEA, a public school must furnish a disabled student with an individualized education program that is "reasonably calculated to enable [the student] to make progress appropriate in light of the [student]'s circumstances." *Endrew F. ex rel. Joseph F. v. Douglas Cnty. Sch. Dist. RE-1*,

---

disturbance."); *cf. O.W.*, 961 F.3d at 794 (holding that a student's egregious and persistent "misconduct that resulted in . . . remov[al] from the classroom *on a daily basis*" triggered the "child find" duty as to suspected emotional disturbance and contrasting such behavior with delinquent behavior "typical of boys his age").

No. 20-50003

137 S. Ct. 988, 999 (2017); 20 U.S.C. § 1401(9).[11] For a student over sixteen like K.S., this program must also provide a transition plan and transition services to help that student emerge from high school into the real world of postgraduation life. 20 U.S.C. § 1414(d)(1)(A)(i)(VIII)(aa)–(bb); 34 C.F.R. § 300.320(b)(1). Because the record amply supports the district court's findings concerning the adequacy of K.S.'s 2016 and 2017 individualized education programs, we will not disturb its conclusion that RISD complied with IDEA.

To determine whether a given program complies with IDEA, we deploy a four-factor balancing test. *See Michael F.*, 118 F.3d at 253. We consider whether:

(1) The student's program was individualized on the basis of the student's assessment and performance;

(2) The program was administered in the least restrictive environment;

(3) The services were provided in a coordinated and collaborative manner by the key stakeholders; and

(4) Academic and non-academic benefits are demonstrated.

*Id.* As we have said before, "the fourth factor is critical." *Renee J. ex rel. C.J. v. Hou. Indep. Sch. Dist.*, 913 F.3d 523, 529 (5th Cir. 2019). And, as the Supreme Court has emphasized, "[a]ny review of an [individualized

---

[11] Among other things, an individualized education program must include "a statement of the [student]'s present levels of academic achievement and functional performance." 20 U.S.C. § 1414(d)(1)(A)(i)(I). It must also describe "how the [student]'s disability affects the [student]'s involvement and progress in the general education curriculum." *Id.* § 1414(d)(1)(A)(i)(I)(aa). And it must set out "measurable annual goals, including academic and functional goals," along with a "description of how the [student]'s progress toward meeting" his goals will be measured. *Id.* § 1414(d)(1)(A)(i)(II), (III).

education program] must appreciate that the question is whether [it] is *reasonable*, not whether the court regards it as ideal." *Endrew F.*, 137 S. Ct. 999.

Appellants' sole quarrel with the district court's analysis on appeal concerns the first *Michael F.* factor.[12] Both of K.S.'s individualized education

---

[12] In their reply brief, appellants raise the new argument that "K.S. did not make meaningful progress" as IDEA requires. This appears to go to the fourth *Michael F.* factor. Even if we were to entertain these new points raised first in reply, we would reach the same conclusion. *Cf. Whitehead v. Food Max of Miss., Inc.*, 163 F.3d 265, 270 (5th Cir. 1998) (noting the general rule against considering points raised first on reply and citing cases but nonetheless rejecting the belated argument on the merits as a matter of discretion).

Appellants incorrectly assert that "[t]he record is devoid of academic progress in K.S.'s reading or mathematics abilities" or of any "behavioral progress." To the contrary, the record contains plenty of evidence that K.S. was making progress toward his goals: For instance, his progress reports expressly state his progress vis-à-vis his program goals in reading and math; his transcripts and RISD personnel testimony at the administrative proceedings indicate steady progress through his grade-level curriculum, including his passage of English and math classes; his PSAT score reflected college-readiness in reading, writing, and math; his disciplinary referrals decreased; and his teachers reported that he responded well to behavioral course corrections. In fact, at the May 2017 due process hearing, one diagnostician stated, "[i]f the rest of our students were doing as well as [K.S.] was, we would be ecstatic." Another said: "We could only hope at this point in time that most of our 11th graders [are] at the point that [K.S. is] at in knowing that he's walking into his senior year prepared to be a senior and ready to finish his credits that he needs for graduation."

Based on the record before us, we cannot say that the district court clearly erred in finding that K.S.'s individualized education program yielded educational and academic benefits. *See Hou. Indep. Sch. Dist. v. Bobby R.*, 200 F.3d 341, 349 (5th Cir. 2000) (finding no clear error in the district court's factual determination that a learning-disabled student received an educational benefit from his individualized education program based on grade improvements and standardized testing); *see also Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist., Westchester Cnty. v. Rowley*, 458 U.S. 176, 207 n.28 (1982) ("When the handicapped child is being educated in the regular classrooms of a public school system, the achievement of passing marks and advancement from grade to grade will be one important factor in determining educational benefit.").

programs, they claim, were not sufficiently individualized to pass muster under IDEA.

Chief among appellants' complaints is that K.S.'s programs were administered primarily via general education accommodations in the ordinary classroom setting; therefore, they did not actually provide "special education and related services" for which K.S. was eligible. *See* 20 U.S.C. § 1414(d)(1)(A)(i)(IV); 34 C.F.R. § 300.306(c)(2). But this claim rests on too narrow an understanding of "special education." They suggest that an individualized education plan must include "direct special education services" or "specialized instruction" outside of the "general education setting." But IDEA's regulations define "special education" more capaciously. *See* 34 C.F.R. § 300.39(a)(1)(i) ("Special education means specially designed instruction . . . to meet the unique needs of a child with a disability, including . . . [i]nstruction conducted in the classroom[] . . . ."); *see also id.* § 300.39(b)(3) ("Specially designed instruction means adapting, as appropriate to the needs of [an IDEA-eligible student], the content, methodology, or delivery of instruction (i) [t]o address the unique needs of the child that result from the child's disability; and (ii) [t]o ensure access of the child to the general curriculum . . . ."). And though it might well be the case that specialized, one-on-one education is the "ideal" for special education, the law requires only the "*reasonable*." *Endrew F.*, 137 S. Ct. at 999.

Having reviewed K.S.'s individualized education programs in the context of the complete record, we agree with the district court and the magistrate judge that RISD did not run afoul of IDEA's substantive requirements. In requiring K.S.'s teachers to, *inter alia*, "change the pace of instruction," "[c]heck for understanding," and "[r]emind[] [K.S.] to stay on task," K.S.'s programs clearly "adapt[ed] . . . the . . . methodology[] or delivery of instruction [t]o address [K.S.'s] unique needs" as a student with

specific learning disabilities, just as IDEA's regulations require and as appellants appear to concede.[13]  34 C.F.R. § 300.39.  In sum, K.S.'s programs were reasonably tailored to his needs even though they were furnished in the general education setting.[14]

Appellants also take issue with K.S.'s program goals and transition plan and services, again complaining of a lack of individualization.  His goals, they point out, are just "recitations of Texas Essential Knowledge and Skills (TEKS) standards for eleventh grade."  But that does not necessarily prove lack of individualization; indeed, as the district court found, the goals were precisely chosen to correspond to K.S.'s particular academic weaknesses.  Individualization does not mean that no two educational programs can be alike.  It simply means that a student's program must account for his individual needs.  And performing at grade level may well be an appropriate goal for a student like K.S.  *See E.R. ex rel. E.R. v. Spring Branch Indep. Sch. Dist.*, 909 F.3d 754, 768 (5th Cir. 2018) (holding a set of TEKS goals, selected for a particular student, to be appropriate and "designed for her unique needs").  We perceive no clear error in the district court's determination that appellants did not meet their burden to show that K.S.'s goals were inappropriate.

---

[13] We have previously affirmed the substantive adequacy of an individualized education plan with similar math and reading goals and only general accommodations. *See Z.C. v. Killeen Indep. Sch. Dist.*, No. W:14-CV-086, 2015 WL 11123347, at *3, *6 (W.D. Tex. Feb. 17, 2015), *aff'd sub nom. Phoung C. v. Killeen Indep. Sch. Dist.*, 619 F. App'x 398 (5th Cir. 2015).

[14] The fact that K.S. also had a special education teacher designated to consult with each of his general education teachers in order to monitor his progress, check his grades, and ensure that his needs were addressed—a resource not available to general education students—also indicates that his education program was suitably individualized.

Finally, K.S.'s education program included "appropriate measurable postsecondary goals based upon age appropriate transition assessments" in keeping with IDEA's requirements for students over the age of sixteen. 20 U.S.C. § 1414(d)(1)(A)(VIII)(aa). In developing K.S.'s transition goals, the committee relied on K.S.'s aspirations, the reports and recommendations of his teachers, and vocational survey data. RISD gave K.S. a smorgasbord of information about transition planning, including information from local colleges, a college preparation checklist, and information from the Department of Assistive and Rehabilitative Services. And K.S. was enrolled in courses of study (a law enforcement training class and a course on wildlife, fish, and ecosystems) geared towards his postsecondary and career ambitions (to study criminal justice and become a game warden). *Id.* § 1414(d)(1)(A)(VIII)(bb) (indicating that "transition services" include "courses of study"). We cannot say that K.S.'s transition plan and services were deficient under IDEA and its regulations. *See id.*; 34 C.F.R. § 300.43; *see also Renee J.*, 913 F.3d at 532–33.

## C.

Before a school district may discipline a disabled student for more than ten days, it must convene a meeting to determine whether the student's conduct that would warrant disciplinary action was a manifestation of the student's disability or a result of the district's own failure to implement the student's individualized education program properly. *See* 20 U.S.C. § 1415(k)(1)(B), (E)(i)(I)–(II). This 'manifestation determination review' must include the student's parent(s) and the committee that created the student's individualized education program, and it must "review all relevant information in the student's file, including the [student's] [individualized education program], any teacher observations, and any relevant information provided by the parents." *Id.* § 1415(k)(1)(E)(i); 30 C.F.R. § 300.530(e)(1). When a Texas student turns eighteen, he inherits his parents' rights to attend

No. 20-50003

and participate.    20 U.S.C. § 1415(m)(1)(A)–(D); Tex. Educ. Code § 29.017(a).

The parties here agree that RISD should have included K.S. in the initial manifestation determination review that occurred in August of 2017, and, having failed to contest the matter below, RISD does not dispute appellants' claim that the manifestation determination reviews failed to consider all relevant information.  The issue, then, is not whether procedural violations occurred; rather, the question is whether the violations that indisputably did occur are *actionable*.  To be actionable, a violation of IDEA's procedural rules must either have:

    I.    "[I]mpeded the child's right to a free appropriate public education;

    II.    significantly impeded the parents' [or adult student's] opportunity to participate in the decisionmaking process regarding the provision of a free appropriate public education to the parents' child; or

    III.    caused a deprivation of educational benefits."

20 U.S.C. § 1415(f)(3)(E)(ii)(I)–(III).  Appellants' briefing centers on the second actionability criterion.[15]

---

[15] Again, appellants attempt to raise new arguments on reply, asserting that the procedural violations at the manifestation determination review "deprived K.S. of educational benefit and impeded [his receipt of a free appropriate public education]."  Even if we were to entertain these arguments, we would not find them persuasive.  RISD remained obligated to implement K.S.'s individualized education program at the disciplinary alternative education center and confirmed that it would be able to do so there.  20 U.S.C. § 1415(k)(1)(D)(i); 30 C.F.R. § 300.530(d).  Appellants have cited nothing in the record to suggest that K.S.'s program was deficiently carried out there.  *See* Reply Br. at 27 (alleging, without record citation, that "K.S. experienced a loss of reading instruction while

No. 20-50003

Appellants essentially assert that: (1) excluding an adult student from a manifestation determination review is a *per se* actionable violation of IDEA as a significant impediment to participation in the decision-making process; and (2) failing to review all relevant information at a manifestation determination review denies a student a free appropriate public education because of the possibility of a different disciplinary outcome. We disagree. As the district court correctly found, appellants "simply have not demonstrated that [these] procedural violation[s] of the IDEA produced substantive harm." *Adam J. ex rel. Robert J. v. Keller Indep. Sch. Dist.*, 328 F.3d 804, 813 (5th Cir. 2003).

First, K.S.'s ability to participate in the decision-making process was not "significantly impeded." 20 U.S.C. § 1415(f)(3)(E)(ii)(II). Although he missed the August meeting, he attended the subsequent September meeting. And although the magistrate judge found that there was "no attempt" proactively to have K.S. weigh in at the September meeting, the report did not identify any procedural violation on the part of RISD personnel that "significantly impeded" K.S.'s *opportunity* to participate at that meeting. The magistrate judge further found, and the record supports the conclusion, that RISD's attendees did not predetermine the outcome of the September meeting in August. Hence, K.S. had the opportunity to participate in an

---

at the [disciplinary center]"). And, in any event, they failed to raise such a claim administratively, so the district court properly declined to consider it.

Appellants further contend that K.S.'s placement at the disciplinary center as a result of the manifestation determination review led them to request K.S.'s early graduation. But a "deprivation of educational benefits" requested by the student and his parent(s) cannot itself render a procedural violation actionable. Rather, as the statute instructs, the procedural violation must itself have "*caused* a deprivation of educational benefits." 20 U.S.C. § 1415(f)(3)(E)(ii)(III) (emphasis added). Appellants' own choice to request early graduation was an intervening cause that broke the chain of causation.

actual decision-making process, even though he did not take advantage of it.[16] For this reason, the procedural violation in August did not ultimately result in substantive, actionable harm. *See E.R.*, 909 F.3d at 769–71 (holding that alleged procedural violations were not actionable because parents were present at a meeting and had the opportunity to participate, even though the record was unclear whether the challenged decision was even "explicitly discussed" at that meeting).

Second, appellants have not shown that K.S.'s right to a free appropriate public education was impeded as a result of the meetings' alleged failure to consider all relevant information. Even assuming *arguendo* that the September meeting would have come out differently if all relevant information were considered, appellants still cannot show that K.S.'s improper placement in the disciplinary alternative educational center impeded his receipt of a free appropriate public education because RISD was still obligated to implement his individualized education program there. *See* 20 U.S.C. § 1415(k)(1)(D)(i); 30 C.F.R. § 300.530(d). Thus, RISD's conceded procedural violation in failing to consider relevant information at both manifestation determination reviews is not actionable.

---

[16] Appellants do not argue that, absent K.S.'s absence at the August meeting, the outcome of the September meeting would have been different. *See* Appellants' Br. 49–51, 54 (arguing, at most, the "possib[ility]" of a different outcome). Nor do they have to: The right to participate is "not the right to dictate an outcome and obviously cannot be measured by such." *White ex rel. White v. Ascension Par. Sch. Bd.*, 343 F.3d 373, 380 (5th Cir. 2003); *but cf. S.H. ex rel. A.H. v. Plano Indep. Sch. Dist.*, 487 F. App'x 850, 866 (5th Cir. 2012) (upholding the district court's conclusion that the "procedural defect" of a meeting participant's absence had an outcome-altering "impact"). Still, K.S.'s attendance at the September meeting, the outcome of which was not foreordained by the procedurally defective August meeting, adequately afforded K.S. the opportunity to participate in the actual decision-making process.

No. 20-50003

IV.

For the foregoing reasons, the district court's judgment is AFFIRMED.