# United States Court of Appeals
## for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**
November 15, 2023

Lyle W. Cayce
Clerk

_____

No. 23-50191

_____

Emiliano Zapata,

*Plaintiff—Appellant*,

*versus*

Hays County Juvenile Detention Center; Brett Littlejohn,

*Defendants—Appellees*.

_____

Appeal from the United States District Court
for the Western District of Texas
USDC No. 1:21-CV-562

_____

Before Jones, Barksdale, and Elrod, *Circuit Judges*.

Per Curiam:[*]

Emiliano Zapata, then 16 years old, was detained for 48 days in the summer of 2020. During this time, Zapata alleges, the Hays County Juvenile Detention Center failed to provide him educational and mental health services. He brought this lawsuit, and the district court granted summary judgment in favor of the Defendants on Zapata's claims under the Eighth

_____

[*] This opinion is not designated for publication. *See* 5th Cir. R. 47.5.

No. 23-50191

Amendment, the Rehabilitation Act, and the Americans with Disabilities Act, and affirmed the prior dismissal of Zapata's Individuals with Disabilities in Education Act claims. Zapata appeals. We AFFIRM IN PART and REVERSE IN PART and REMAND for further proceedings. We also AFFIRM the prior dismissal of Zapata's claims arising under the Individuals with Disabilities in Education Act.

I

A

The Hays County Juvenile Detention Center is a correctional facility in San Marcos, Texas, operated and overseen by the Hays County Juvenile Board, that provides pre- and post-adjudication detention for juveniles. The Detention Center contracted with the John H. Woods Charter School—Inspire Academy to serve as the "local education agency" and to provide educational services under the IDEA to its residents. In May 2020, the Detention Center had a 14-day isolation requirement for new detainees to prevent the spread of COVID-19.

Zapata was sent to the Detention Center on May 20, 2020, upon his arrest. Texas law demands that detention facilities conduct "[a] health screening" for juvenile pre-trial detainees "within two hours before or after admission," 37 Tex. Admin. Code § 343.406(a), so upon his arrival, Detention Center personnel administered multiple assessments to Zapata.

First, Zapata's Intake Assessment. In the portion titled "Information From Child," the officer marked "N" as to whether Zapata was in any special education classes. The official "also noted in the form that [Zapata] did not appear confused, depressed, agitated, or angry, and that he did not appear to be suicidal or violent." Detention Center personnel documented that Zapata "may be dangerous to himself [] or . . . may threaten the safety of the public if released."

Zapata was next given an Initial Health Assessment, which lists "No" in response to whether he "had or [is] being treated for any mental conditions/disorders." Zapata also denied taking any medications. The screening officer opined that Zapata did not "appear to need mental health services" and that he did not need a referral for medical or emergency services.

A staff member then administered a Behavioral Screening assessment. When asked, "Have you had or are you being treated for any mental disabilities?", and "Do you have any Intellectual or Developmental Disabilities?", Zapata responded "No." The official observed that Zapata had an "Average" "Level of Emotional and Cognitive Development," with the other possible answers being "Low" and "High." And when asked to identify any other information regarding his mental abilities, Zapata did not offer additional details.

The next morning, a nurse administered Zapata's health appraisal. The nurse described Zapata's behavior as "appropriate" during the assessment, and Zapata denied having any mental health conditions or attendant treatments, save for trouble sleeping.

As a new detainee, Zapata was subject to the facility's 14-day quarantine protocols upon arriving. Throughout this initial quarantine, call logs show that Zapata called his father seven times. On June 4, 2020, Zapata's initial medical isolation concluded, and he was released into the facility's general population. Two weeks later, on June 17, 2020, Zapata left the Detention Center for several hours for a psychological evaluation, which was conducted by Dr. Keeley Crowfoot.

On June 24, Zapata tested positive for COVID-19 and was immediately placed in medical quarantine. Throughout this second isolation, Zapata could not call his father because the telephone was in a public space.

Instead, Zapata wrote letters to his father and was given an email that his father wrote to him. On July 5, Detention Center officials decided to conduct daily counseling with Zapata. Pursuant to that schedule, he received his first counseling session the day he was released from quarantine, July 6. The following day, Zapata was discharged from the Detention Center.

B

Zapata filed an administrative complaint under the IDEA concerning his detention, which was heard and subsequently dismissed by a Texas Special Education Hearing Officer. Zapata then commenced this action against the Detention Center and its administrator, Brett Littlejohn, seeking review of the Special Education Hearing Officer's dismissal of his IDEA claims as well as alleging violations of: (1) his Eighth Amendment rights brought under 42 U.S.C. § 1983; (2) section 504 of the Rehabilitation Act; and (3) the Americans with Disabilities Act.

The parties filed dueling motions for summary judgment. The district court granted the Detention Center's and Littlejohn's joint motion on all claims, concluding that (1) the local education agency, not the Detention Center, is "tasked with providing the relevant services" such that failure to provide them did not render the Detention Center liable under the IDEA and dismissal by the Special Education Hearing Officer was appropriate; (2) the Detention Center was not on notice of Zapata's disability and, even if it had been, the facility provided a reasonable accommodation as required by the Rehabilitation Act and the ADA; and (3) Littlejohn was not a policymaker, vitiating any *Monell*-based claims under § 1983. Zapata appeals.

II

"We review a grant of summary judgment *de novo*, viewing all evidence in the light most favorable to the nonmoving party and drawing all reasonable inferences in that party's favor." *J.W. v. Paley*, 81 F.4th 440, 447

(5th Cir. 2023) (citation omitted) (italics added). "Summary judgment is appropriate only when the moving party establishes that 'there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Id.* (quoting Fed. R. Civ. P. 56(a)). "We may affirm a summary judgment on any ground supported by the record, even if it is different from that relied on by the district court." *Campos v. Steves & Sons, Inc.*, 10 F.4th 515, 520 (5th Cir. 2021) (citation omitted).

Notably, "IDEA litigation invariably involves an inextricable tangle of law and fact." *Leigh Ann H. v. Riesel Indep. Sch. Dist.*, 18 F.4th 788, 794 (5th Cir. 2021) (citation omitted). "We review the district court's decision *de novo*, as a mixed question of law and fact, and the district court's underlying findings of fact for clear error." *Krawietz ex rel. Parker v. Galveston Indep. Sch. Dist.*, 900 F.3d 673, 676 (5th Cir. 2018). A district court commits clear error only when "we are 'left with a definite and firm conviction that a mistake has been committed.'" *R.P. ex rel. R.P. v. Alamo Heights Indep. Sch. Dist.*, 703 F.3d 801, 808 (5th Cir. 2012) (quoting *Hou. Indep. Sch. Dist. v. V.P. ex rel. Juan P.*, 582 F.3d 576, 583 (5th Cir. 2009)).

## III

### A

Zapata appeals the district court's order affirming the Special Education Hearing Officer's dismissal of his IDEA claim as having been brought against the wrong defendant.

Enacted by Congress in 1970, the IDEA requires that "all children with disabilities," including incarcerated children, receive a "free appropriate public education." *Texas Educ. Agency v. U.S. Dep't of Educ.*, 908 F.3d 127, 130 (5th Cir. 2018); *see* 20 U.S.C. § 1412(a)(11)(C). States are responsible for implementing its provisions and adhering to its safeguards. *See* 20 U.S.C. § 1412(a). Relevant here, the IDEA endows states with near-

plenary authority to do so as they see fit, including the right to "assign to any public agency in the State the responsibility of ensuring that the requirements of this subchapter" are met for incarcerated children. *Id.* § 1412(a)(11)(C). Because the IDEA authorizes states to transfer in full the responsibility of IDEA compliance to another governmental entity, "questions of which agency is responsible for providing a student with a [free appropriate public education] are determined under state law." *L.A. Unified Sch. Dist. v. Garcia*, 669 F.3d 956, 960 (9th Cir. 2012) (citing *Union Sch. Dist. v. Smith*, 15 F.3d 1519, 1525–27 (9th Cir. 1994)).

Texas state law requires "[t]he Texas Education Agency, the Health and Human Services Commission, the Department of Family and Protective Services, and the Texas Juvenile Justice Department" to "establish the respective responsibilities of school districts and of residential facilities for the provision of a free, appropriate public education, as required by the [IDEA] . . . , including each requirement for children with disabilities who reside in those facilities[.]" Tex. Educ. Code Ann. § 29.012(d). Pursuant to an agreement codified into law by these agencies, local education agencies—not detention facilities—are responsible for "provid[ing] or ensur[ing] the provision of a [free appropriate public education] to students with disabilities residing in [residential facilities] in accordance with [the] IDEA, applicable federal regulations, and state laws and rules." 19 Tex. Admin. Code § 89.1115(d)(1)(A).

The Detention Center is such a "residential facility," Tex. Educ. Code Ann. § 5.001(8), meaning a local education agency with which it works—not the Detention Center itself—is responsible for IDEA compliance. Under this framework, the John H. Woods Charter School—Inspire Academy agreed to be the Detention Center's local education agency and to take responsibility for its IDEA compliance. Thus, we agree with the Special Education Hearing Officer and the district court that Texas's

delegation of responsibility and the operative contract between the Detention Center and the local education agency absolves the Detention Center of responsibility for IDEA implementation and compliance.

Zapata argues that federal regulations prohibit the state from relinquishing responsibility in full for IDEA compliance and absolving itself from attendant liability arising from IDEA shortcomings. Like the district court, we disagree.

Zapata relies on 34 C.F.R. § 300.2(b), which reads: "The provisions of this part—(1) Apply to all political subdivisions of the State that are involved in the education of children with disabilities, including: (i) The State educational agency . . . [and] (iv) State and local juvenile and adult correctional facilities[.]" Zapata cites no authority for his implied proposition that this regulation overrides the U.S. Code provision that allows a state to "assign to any public agency . . . the responsibility of ensuring" IDEA compliance for incarcerated children. 20 U.S.C. § 1412(a)(11)(C). Nor could he, for "[w]hen [] regulations are contrary to the wording of the statute itself, [] this Court must follow the plain statutory language and not the regulations." *Salinas v. Rodriguez*, 963 F.2d 791, 793 (5th Cir. 1992). Rather, the "harmonious interpretation of the statute[] [and] the regulations," *id.* at 794, is that a detention facility is responsible for meeting IDEA's mandates *unless* a state government assigns that specific responsibility to another agency or organization. Because Texas charged local education agencies with IDEA compliance, the Detention Center cannot be held liable for IDEA noncompliance.

B

Zapata also appeals the district court's order granting the Detention Center and Littlejohn summary judgment on his Rehabilitation Act and ADA claims.

"The prima facie case of discrimination under the [Rehabilitation Act] is operationally identical to the test under the ADA." *Austin v. City of Pasadena*, 74 F.4th 312, 334 (5th Cir. 2023) (quoting *Melton v. Dall. Area Rapid Transit*, 391 F.3d 669, 676 n.8 (5th Cir. 2004)). We thus evaluate these claims simultaneously, though we refer only to the ADA for clarity.

To establish a prima facie case under the ADA, a plaintiff must show:

(1) that he is a qualified individual within the meaning of the ADA; (2) that he is being excluded from participation in, or being denied benefits of, services, programs, or activities for which the public entity is responsible, or is otherwise being discriminated against by a public entity; and (3) that such exclusion, denial of benefits, or discrimination is by reason of his disability.

*Cadena v. El Paso Cnty.*, 946 F.3d 717, 723 (5th Cir. 2020) (quoting *Melton*, 391 F.3d at 671–72).

"[A] plaintiff can establish the third prong of the prima facie case—discrimination 'by reason of his disability'—by showing that the defendants have failed to make reasonable accommodations." *Valentine v. Collier*, 993 F.3d 270, 290 (5th Cir. 2021) (quoting *Windham v. Harris Cnty.*, 875 F.3d 229, 235 (5th Cir. 2017)). "For this type of claim, a plaintiff must show that the entity knew of the disability and its consequential limitations, either because the plaintiff requested an accommodation or because the nature of the limitation was open and obvious." *Cadena*, 946 F.3d at 724 (citing *Windham*, 875 F.3d at 236–37).

The parties do not dispute that Zapata is a qualified individual. Rather, they dispute whether the Detention Center had knowledge of Zapata's disabilities and whether Zapata was given a reasonable accommodation. The district court concluded that Zapata failed to show a genuine dispute of material fact as to whether the Detention Center "knew

of his disability, and . . . [whether] he was provided with a reasonable accommodation." We disagree.

Within two weeks of Zapata's release from his initial medical quarantine, he left the facility for a psychological evaluation by Dr. Crowfoot. Days later, Littlejohn received Dr. Crowfoot's report, which diagnosed Zapata with Anxiety Disorder, Posttraumatic Stress Disorder, Major Depressive Disorder, Autism Spectrum Disorder, and various Specific Learning Disabilities. The report also notes Zapata's feelings of anxiety and depression, the trauma he experienced in his family life, and his history of suicidal ideations. Finally, the report provides a laundry list of recommendations including counseling and regular assessments for suicidal ideations as well as his anxiety. This direct language may very well have placed the Detention Center and Littlejohn—its recipient—on notice of Zapata's "disabilities, limitations, and possible accommodations." *Taylor v. Principal Fin. Grp., Inc.*, 93 F.3d 155, 165 (5th Cir. 1996).

The district court dismissed the report simply because "Dr. Crowfoot listed a series of 'diagnostic impressions' rather than a conclusive diagnostic," meaning it could not place the Detention Center on notice. The Detention Center does not push this reasoning with much force on appeal, though it cites medical dictionaries that distinguish between a diagnosis and a diagnostic impression. This is a distinction without a difference.

Though the above-quoted section is titled "Diagnostic Impressions," the table naming these diagnoses reads: "Principal *Diagnosis* and Specifiers." Furthermore, when the report refers to these illnesses elsewhere, it uses the term *diagnosis*. To conclude, then, that no fact dispute remains and that this report did not notify the Detention Center of Zapata's disabilities is to demand a degree of specificity not required by our caselaw, missing the forest for the trees—particularly when our posture commands us to review the

evidence in the light most favorable to Zapata.  *J.W.*, 81 F.4th at 447. Accordingly, we conclude that there is a genuine dispute of material fact as to whether the report put the Detention Center on notice of Zapata's disability.[1]

Given this conclusion, we turn to whether the Detention Center provided Zapata a reasonable accommodation.  Upon receipt of the report, Littlejohn testified, the Detention Center did not immediately modify its plans for Zapata.  Instead, record evidence shows that several days after Littlejohn received the report, the Detention Center decided to conduct daily counseling with Zapata upon his release.  Indeed, Zapata received "a counseling session on July 6, 2020, as soon as he was released from medical quarantine and less than a week after Littlejohn received Dr. Crowfoot's report."  Without much analysis, the district court determined that this counseling session was a reasonable accommodation as a matter of law.

We conclude that a genuine dispute of material fact precludes such a determination at this stage.  Whether a proposed accommodation is reasonable may sometimes turn on considerations that are best reserved "for the trier of fact."  *See Riel v. Elec. Data Sys. Corp.*, 99 F.3d 678, 683 (5th Cir. 1996); *see also Jones v. Lubbock Cnty. Hosp. Dist.*, 834 F. App'x 923, 926 (5th Cir. 2020) (unpublished) ("Whether a proposed accommodation is reasonable is generally a fact issue.").  On June 18, 2020, Zapata was placed on medical observation after showing signs of COVID-19, only to be placed in quarantine after testing positive.  Zapata's quarantine was extended on July 3, as he remained symptomatic, and he was ultimately released from

_____

[1] Zapata also argues that the Detention Center was on notice based on statements he made during his intake assessments and his father's outreach. Because we conclude that Dr. Crowfoot's report may have put the Detention Center on notice, we need not resolve these secondary arguments.

isolation on July 6. The day he was released, he received a counseling session, and the next day, he was discharged. The Detention Center argues that the counseling session conducted the day he was released from quarantine was reasonable as a matter of law. The record does not compel this conclusion.

Zapata's father testified that during Zapata's initial quarantine, he was able to have daily phone and video calls with Zapata. The Detention Center offers no evidence that such technology could not have been deployed while Zapata was in his second quarantine, while Littlejohn also testified that he received information regarding "a free online tool kit for individuals supporting children and youth autism during COVID-19." It may be the case that securing such equipment could have jeopardized other detainees' safety, thereby militating against any accommodation beyond the delayed counseling session. But the costs imposed by several more days in isolation were potentially severe given Zapata's youth and mental state. Here, too, there is a genuine dispute of material fact.

Because genuine disputes of material fact exist both as to whether the Detention Center was aware of Zapata's disabilities, and whether its accommodation was "reasonable," we must reverse and remand on the Rehabilitation Act and ADA claims.

C

Finally, Zapata appeals the dismissal of his constitutional claims, brought under 42 U.S.C. § 1983, that the Detention Center violated his Eighth Amendment rights. The district court did not reach the merits of his claims, instead granting summary judgment because Littlejohn "is not a policymaker for purposes of *Monell* liability." We agree.

In lawsuits against municipal actors in their official capacities, plaintiffs must prove the following elements of a suit against a municipality under *Monell v. Department of Social Services*: (1) a policy maker; (2) an official

policy; and (3) a violation of constitutional rights whose "moving force" is the policy or custom. 436 U.S. 658, 694 (1978). Regarding the first element, "[t]he authority to make municipal policy is necessarily the authority to make *final* policy." *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988) (plurality opinion). "[W]hether a particular official has 'final policymaking authority' is a question of *state law*." *Jett v. Dall. Indep. Sch. Dist.*, 491 U.S. 701, 737 (1989) (quoting *Praprotnik*, 485 U.S. at 123 (plurality opinion)).

Years ago, we held that "state law supports the conclusion that the Juvenile Board possesses authority to establish official policy for [a] detention center" run by a county. *Flores v. Cameron Cnty.*, 92 F.3d 258, 264 (5th Cir. 1996) (citing Tex. Hum. Res. Code Ann. § 152.0372). Thus, Littlejohn cannot be considered the appropriate policymaker unless the Hays County Juvenile Board has delegated policymaking authority to him. But the operative policy, the Detention Center's 2020 Policy and Procedure Manual, plainly states that it is subject to annual inspection and approval by the Hays County Juvenile Board. Because the Detention Center and Littlejohn as its administrator must answer to the Hays County Juvenile Board regarding the policy at issue, it cannot also be the case that Littlejohn has been delegated the policymaking authority necessary to sustain Zapata's claim under *Monell*.

\* \* \*

We AFFIRM IN PART and REVERSE IN PART and RE-MAND for further proceedings.